# Case No. 17,165.

## WARDER et al. v. LA BELLE CREOLE.

[1 Pet. Adm. 31.][1]

### District Court, D. Pennsylvania. 1792.

SALVAGE — DERELICT — ABANDONMENT—WHO MAY ABANDON—COMPENSATION—DEVIATION.

[1. The cases of dereliction, in which the doctrine that things abandoned become the property of the first occupant is founded, generally run on the principle of a voluntary abandonment by the owner with his free consent, and not on such a relinquishment as force, necessity, or danger compel.]

[2. The owner alone can make such an abandonment. The master cannot do so, even by an express consent to give the goods to the salvors.]

[3. The promises of the master in respect to the quantum of salvage are not to be regarded, when made in time of distress, but the reward must be measured according to circumstances.]

[4. Ships forsaken through fear of enemies or loss of life are not legally derelict, so as to warrant full right by occupancy.]

[5. Delays for saving ships, goods, or mariners, producing uncommon risks, are deviations which are not excused, under policies of insurance as generally made, and the increased risk incurred by the owner is to be considered in determining the question of salvage.]

[6. The principle of salvage compensation is not confined to mere quantum meruit, as to

[1] [Reported by Richard Peters, Jr., Esq.]

the persons saving, but is expanded so as to comprehend a reward for the risks of life and property, labor and danger, as well as a premium operating as an inducement to similar exertions.]

[Cited in Clayton v. The Harmony, Case No. 2,871; Brevoor v. The Fair American, Id. 1,847; Coulon v. The Neptune, Id. 3,273. Approved in Bond v. The Cora, Id. 1,621; Hand v. The Elvira, Id. 6,015. Cited in The Dupuy de Lome, 55 Fed. 95.]

[7. Salvage also varies according to the description and value of articles saved. On plate, jewels. and money, it is the least, and on other articles according to circumstances.]

[8. The ship Amiable encountered the French ship La Belle Creole at sea, in a perishing and hopeless condition, and remained by her at some risk, and with considerable delay; taking out the officers and crew, part of the ship's furniture, wares, and merchandise, and also some plate and money. *Held*, that the salvors should be awarded one-third the gross proceeds of the goods, wares, and merchandise, and one-eighth of the appraised value of the plate and money.]

[Followed in Taylor v. The Cato, Case No. 13,786. Cited in Markham v. Simpson, 22 Fed. 745.]

PETERS, District Judge. The state of the case will appear in the libel, and the testimony and exhibits in this cause.[1] The testimony, though in some points contradictory, and in many irrelevant, will shew, from a general view of it, the leading facts. I have, in addition thereto, examined the log-books of both ships, and find by the state of the winds and weather, as therein mentioned, that the Amiable was retarded in her passage, by the circumstances related in the libel; though, for some time during her stay with the Belle Creole, the winds were adverse. The distressed and hopeless condition of the Belle Creole, is described in her log-book, in the great points nearly according with the testimony. This log-book confirms, in many important points, the testimony on the part of the libellants, contradicts, in some instances, and supplies in others, facts omitted by the witnesses for the claimants and respondents. I do not find that the Amiable was in any real, though, like all vessels loitering on a coast, she was exposed to possible, danger, and unnecessarily protracted risque.

There have been three points made in this cause: 1st. Dereliction, and a claim of the whole under words used by the captain, said to amount to an express abandonment; and, from the circumstances of the case, a dereliction by implication. 2d. That the delay of the Amiable, while attending on, and giving assistance to, and saving the goods out of, the Belle Creole, was a deviation which exposed to risque, out of the common course of the voyage, and would have forfeited any insurance which might have been made on the vessel and cargo, or either of them. 3d. The quantum of salvage, if the first point should be determined against the libellants.

On the first point I have translated an authority out of Burlemaqui, which contains

what I believe to be an accurate account of the ideas of the best writers on the subject of dereliction, and occupancy, consequential upon it: "One may acquire, by the right of the first occupant, things which the proprietor has abandoned with a design never more to hold them as his own. Although one is not in possession of a thing, the right of recovery is not lost, unless it is renounced in a manner either express or implied. Hence the i... .astice of those countries which confiscate the property of goods shipwrecked, thrown overboard to lighten the vessel, or stolen, in place of returning them to the owners." The cases of dereliction, in which the maxim of "Occupantis fiunt derelicta" is founded, generally run on the principle of a voluntary abandonment by the owner, with his free consent; and not on such a relinquishment as force, necessity, or danger, compel. The instances of wreck, or goods thrown overboard to lighten the vessel, may be given to elucidate this doctrine; and these are always recoverable, on payment or tender of salvage. It should seem that little prospect of recovery existed in the case of goods ejected, to lighten and save the ship; yet the right of recovery is not lost; but, on proof of property, they are recoverable, on payment, or tender of salvage, if either driven on shore, or taken flotsam or jetsam. If the evidence in this cause, supported (and I think it does not) the captain's consent to give the goods to the libellants, I do not consider it as binding on the owners; and, according to the authority from Burlemaqui, (and many others) it must be the owner who abandons. The captain is vested with certain powers, both express and implied, over the ship and goods, for certain purposes beneficial to the owner; such as the power of hypothecation—of compounding for part, to save the rest—detaining for freight—throwing over part to preserve the residue—but herein he has a qualified and not an absolute propriety. He may act, under the limited rights with which he is thus invested for the benefit of the owner, but cannot totally divest him of all the right, and transfer it, without special authority, even for a valuable consideration. He is inhibited, by the marine laws, to sell (though he may pledge) the tackle, or furniture saved from shipwreck, though necessary for the subsistence or payment of himself and crew: nor, even in cases of the quantum of salvage, should promises made by the master, in time of distress, be regarded; but the reward must be measured according to circumstances. Much less to be valued are the expressions he makes use of, tending to shew a dereliction, or abandonment of the property. I cannot, therefore, be of opinion that, in this case, there is an express dereliction, in the legal interpretation of the word. As to the implied dereliction, there are no circumstances to prove it, but those which generally accompany such unfortunate cases. If these were to be taken as proofs of abandonment, on which the right of occupancy would attach, there would be an

---

[1] [See note at end of case.]

end to all enquiries relating to salvage, in instances of ships or goods forsaken. But the law is otherwise; and the ship, though forsaken, through fear of enemies, or to save the lives of the people, is not legally derelict, or even wreck or lost. I shall therefore dismiss, as untenable, the first point made in this cause, with the supplemental libel on which it arises.

As to the second point, which respects the quantum of salvage, and tends to shew the risque incurred, by the assistance given to the master and crew of the Belle Creole, to wit, the deviation, I should, in a case which I was under the necessity of determining, consider it as such. I am persuaded that the delay of the Amiable exposed her to uncommon danger: and, as it was not necessary, in the course of the voyage, for any purposes which insurers might have had in view, but was merely produced by the circumstances stated in the libel, it would, I think, have availed, in case of loss, to repel a claim of insurance. And the principle is the same, as to all consequences necessary to be considered in this cause, whether the owner remained his own insurer, or threw the risque on others, by a policy descriptive of the voyage. A deviation is not merely the unnecessary going out of the track, or course usually taken, but it is also a departure from either the express or implied terms of the contract. It needs not much reasoning or discussion to shew that delays for saving of ships, goods or mariners, producing uncommon risque, cannot be legal excuses on the part of the insured on policies as they are generally made. Such delays being breaches of the implied terms of the contract, by exposing to hazards not originally counted upon, foreseen, or in the contemplation of the parties. They are justified to the heart, though not (in this respect) to the law, on principles of humanity, commendable in themselves, expected from all, and particularly from those who are exposed to similar misfortunes. Ships with letters of marque may chase an enemy, but cruising after prizes incurs deviation. But, without entering into many particular references to cases or instances, it appears to me that all excuses for leaving the course, or delays must be from necessity; and not with a view to lucrative objects. Putting into port by stress of weather—to stop a leak—obtain provisions, &c.—going out of the track to avoid an enemy —for convoy or other purposes—for the safety of the ship or goods, being beneficial to the insurers, are justifiable. But it is different in the case of cruizing for prizes, and cases of a similar nature, which might be mentioned: and none of them appear to me stronger than the one in question.

On the third point I have taken into consideration all the circumstances of the case, and the law respecting it, so far as I can perceive it applicable. With respect to goods and merchandize, I can find no decided rules as to the proportion of salvage; those of the maritime laws, which have made any designations of proportions, varying from each other, and giving from a twentieth to a half, according to the description and value of the articles saved, and the risk, labour, and expense of salvage. On plate, jewels and money, the salvage is the least: and on articles of other descriptions, according to circumstances. I find, however, that the former articles are not exempted, either from average, contributions, or salvage. The general principle is not confined to mere quantum meruit, as to the person saving; but is expanded, so as to comprehend a reward for the risk of life and property, labour and danger, in the undertaking, as well as a premium operating as an inducement to similar exertions. It is laid down as a principle both of justice and policy, that "he who has recovered the property of another from imminent danger, by great labour, or perhaps at the hazard of his life, should be rewarded by him who has been so materially benefitted by that labour."

I consider, in the case in question, the property risked by the owners of the ship Amiable combined with the danger to which her officers and crew were exposed in the enterprise; and, though I do not depreciate the exertions of the officers and crew of La Belle Creole, yet all these exertions would have been useless, unnecessary, and impracticable, if the Amiable had not been present and exposed in the undertaking to risk, and her officers and crew to danger. The labour and difficulty, too, exercised and experienced by the latter, were considerable, and unremitted. The season of the year, and the place where the transaction happened, exposed the Amiable and her cargo to extraordinary hazard. With respect to the proportion of salvage, all circumstances taken into view, I have, in the general, been guided by what I consider just in the present case, as well as politic in all cases. Combining both these circumstances together, I cannot have a better guide, nor one which ought to be more satisfactory to one of the parties in this cause at least, than the 17th article of book 4, c. 19, of the Marine Ordinances of France, on the subject of wreck, which I have translated: "If the effects, however wrecked, are found on the sea, or drawn from its bottom, the third part thereof shall be immediately delivered, without expense, either specifically or in money, to those who have saved them, and the two other thirds shall be kept to be delivered to the owners, if they shall claim them within the time above mentioned: after which they shall be equally divided between us and the admiral, the costs of prosecution being previously deducted from the two thirds." Although I do not exactly follow, yet I have as nearly accommodated my determination to this ordinance, as I think right. I do therefore adjudge, order and decree, that the libellants in this cause, to wit, the owner or own-

ers of the ship Amiable, and the master, first and second mate, the carpenter, and crew (including boys and cook) of the said ship, have and receive, in full satisfaction, for and as salvage, the one third part of the gross amount of the sales of the goods, wares and merchandize, as mentioned in the account of sales rendered by the marshal of the district, free and clear of all expenses, costs, duties and charges whatsoever; and also the one eighth part of the appraised value and amount of the plate and money mentioned in the inventory, No. 2, to be divided among the said owner, or owners, master, mates, carpenter and crew, in the following proportions, to wit:

Three fourth parts thereof shall be received and taken by Jeremiah Warder or the owner or owners of the ship Amiable, for his and their sole and separate use and property. That the remaining fourth part of the said salvage (which, though less than is common in a case of prize in war, is, I think, with their wages, sufficient: as the danger of conflict did not exist, which as to prizes adds to the risk, and increases the reward) shall be divided to and among the officers and crew of the said ship, in manner following, to wit, the said fourth part shall be divided into twenty-six equal shares or parts, whereof

|  | Shares |
|---|---|
| The captain shall and is hereby directed to receive | 8 |
| The chief mate | 4 |
| The second mate | 3 |
| The carpenter | 2 |
| And each mariner and the cook one share | 8 |
| Each boy half a share | 1 |
| Amounting in the whole to | 26 |

That the plate and money shall be restored to Captain Davor, for the use of himself and those of the French officers and crew of La Belle Creole, to whom the articles therein contained respectively belong, on payment of the proportion of the appraised value thereof, herein before decreed for salvage. That the whole amount of the proceeds of the sales, of the goods and merchandize, as mentioned in the marshal's return, and account of sales, together with the salvage decreed on the plate and money, be brought into court: and, after paying thereout the one third of the amount of the former, and the salvage as aforesaid on the latter, the other two remaining thirds shall be subject to the following expenses and payments, which are hereby directed to be discharged and made forthwith.

The costs accrued, and to accrue, in this cause, shall be fully paid and discharged, and all expenses incurred in the storage, and on the sale of the whole, as they shall be examined and taxed; and all duties and customs therein legally chargeable, and charged, shall also be paid thereout. After all the said costs and charges and duties shall be fully paid and discharged, the balance of the said two thirds shall remain in this court, subject to the further order, judgment and decree thereof.

NOTE. The libel states that, on the 10th day of November, 1792, the Amiable being on a voyage from Charleston, South Carolina, for Philadelphia, a ship was discovered in distress: upon which the Amiable shortened sail, changed her course, and found said ship to be La Belle Creole, commanded by Davor, bound to Bordeaux. La Belle Creole was declared to be sinking, and the master of the Amiable requested to remain by her, which was done by making light sail on board the Amiable. The distress of La Belle Creole continued; the weather was tempestuous, and on the 12th, after repeated solicitations from the master and crew of La Belle Creole, they were received on board the Amiable; and, before they left La Belle Creole, a proposition was made by them to burn her. On the master and crew of La Belle Creole leaving their ship, they declared they relinquished and abandoned her, and every thing on board of her. La Belle Creole was left without a living person on board of her. On the following morning she was again boarded by the master and crew of the Amiable, and a large quantity of merchandise taken from her. On the evening of the same day, at the request of Captain Davor, she was set on fire. The Amiable afterwards arrived in Philadelphia. The libel prays a reasonable salvage may be allowed.

A supplementary libel was afterwards filed, in which the goods are claimed by the owners, master, and crew of the Amiable, as wholly belonging to them "as goods derelict and abandoned," and their delivery to the owners, &c. is prayed.

The claim and answer of Captain Davor, master of La Belle Creole, state, that his ship was in great distress, and in danger of perishing; and that he, together with his crew, were taken on board the Amiable on the 15th day of November. That on that day, and before and afterwards, the mate of the Amiable, and some mariners belonging to her, together with the crew of La Belle Creole, saved the goods and materials libelled and claimed. Captain Davor denies the abandonment of the ship and cargo, but declares an intention was entertained by him to repossess the same, should he at any time after be able so to do; and particularly denies the surrender of La Belle Creole, &c. to the master and crew of the Amiable: and asserts, that the said master and crew of the Amiable, at the period aforesaid, declared that all they saved was for the master and crew of La Belle Creole. The claim and answer further state, that the master of La Belle Creole could not abandon the goods, &c. as they did not belong to him, but to persons in France; and that, even had they so abandoned them, the same being done under the impression of fear and danger, and from extreme necessity, could have no effect. It is also stated that, as the respondents were always in sight, or within reach of the property, and assisted in saving them, by the civil and maritime law they cannot be considered as derelict. The respondents say they are willing to allow the libellants "a reasonable salvage, proportionate to their trouble and exertions." Captain Davor states that the articles found in his trunks, not being merchandise, but money, furniture, &c. belonging only to himself, and the mariners of La Belle Creole, are not by the maritime law and custom liable to salvage; he therefore prays, that the marshal be ordered to return the same to him, free of salvage and all charges.

By the depositions of the witnesses produced on the part of Warder and others, the principal facts, as stated in the libel, are established; and it is further stated, that at the time the master and crew of La Belle Creole were taken on board the Amiable, and before the greater part of the goods were saved, Captain Davor

ordered the ship to be burned, and this was only prevented by the interference of the master of the Amiable. It is further stated, that after the master and crew of La Belle Creole were received on board the Amiable, they lost sight of the said vessel, and, supposing she had gone down, the master of the Amiable determined to proceed to America. When the sun rose the next day La Belle Creole was discovered, boarded, and the greater part of the articles saved were taken on board the Amiable. She had, at this time, eleven feet of water in the hold, and the water was up to the cabin floor; on leaving her she was set on fire. It is also admitted in the depositions of these witnesses, that the crew of La Belle Creole assisted in saving the goods, &c. After the arrival of the Amiable in Philadelphia, an attempt was made, by the officers of La Belle Creole, to bribe the mate, and one of the seamen of the Amiable, to assist in smuggling some of the articles saved. In the depositions of the witnesses produced on the part of the respondents, some of the circumstances stated in the claim and answer are detailed; but no proof was offered in support of the assertion in the claim and answer, that Captain Davor entertained any expectation, or intention, that he would, at any time, regain possession of the ship, goods, &c. One half of the cargo of La Belle Creole had been thrown overboard before the Amiable was spoken; and, but for her assistance, all would have perished.