## Case No. 9,493.

### MESNER et al. v. SUFFOLK BANK.

### [1 Law Rep. 249.]

District Court, D. Massachusetts. Nov., 1838.

SALVAGE—DERELICT—PROPERTY OF PASSENGER—REWARD OFFERED—SALVORS—SHIP'S COMPANY—COMPENSATION—EXTRAORDINARY EXERTIONS.

1. The steamboat New England, on her passage from Boston, for ports and places on the Kennebec, by collision with the schooner Curlew, sailing in an opposite direction, was so severely injured as to be deemed in immediate danger of sinking, and, under that apprehension, was left by all on board. The passengers, and part of the crew went on board the Curlew, the master with other officers and the residue of the crew remained in small boats about the wreck, employed in saving articles found floating, and after a brief interval, judging it safe so to do, again went on board, for the purpose of saving, and did save baggage of passengers, money and other property to a large amount.

2. The New England under these circumstances, and at the time when the alleged services of the libellants were performed, ought not to be considered as derelict.

3. The rules of the marine law, relative to the exertions required of seamen in cases of shipwreck, or of disaster at sea, are equally applicable to navigation by steamboats.

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

4. The distinction, or exception, by which pilots in the usual mode of navigation, have, in some instances, been admitted as salvors, is not applicable to pilots or engineers of steamboats, belonging to the ship's company.

5. A promise of reward from a passenger, in the circumstances above described, to officers, or crew of the distressed vessel, to secure their exertions for saving his property, held not to be legally binding.

6. Where there is a presumption of blame, as to the collision on the part of the steamboat, if such presumption be not repelled by evidence, a claim of compensation by any of the officers or crew of such steamboat, for extraordinary exertions, is not maintainable.

7. Nor is a suit against a passenger, or other person having property thus saved, to be sustained, when instituted separately and after the payment of wages, in full, to those engaged in that service, without claim or demand on their part at that time or previously for any such extra compensation.

[This was a libel by George Mesner, late chief engineer of the steamboat New England; George Stillfin, late pilot of said boat; Fitz Goodin, late deck hand, and James Collins, late a wheelman, on said boat,—against the president, directors and company of the Suffolk Bank, for salvage.]

B. R. & G. T. Curtis, for libellants.

S. Hubbard, B. R. Nichols, and C. Atwood, for respondents.

DAVIS, District Judge. This libel is for salvage service alleged to have been performed, for the benefit of the respondents, in saving two packages of bank bills, of the declared value of $50,000, asserted to have been saved, under circumstances of great peril and extremity from the captain's office in the steamer New England, in which that property had been deposited by Joseph H. Dorr, agent of the Suffolk Bank, the said steamer having been previously deserted by all on board from apprehension of her sinking, after a disastrous collision with another vessel, the schooner Curlew; the exertions of the libellants in the premises being, as they assert, induced by a reward of five thousand dollars, offered by said Dorr, one of the passengers in the New England. The respondents place their defence on the following averments, summarily collected from their answer. First. That the night on which the collision occurred, was very pleasant with little wind, the sea calm, and the atmosphere so clear, that a vessel could be seen at the distance of several miles; that the schooner was sailing at a slow rate, and under usual sails; that the steamer was proceeding with great velocity, under high steam, and with several sails spread, and that under such circumstances, the collision could not have occurred, but through a defect of duty, on the part of the officers and crew of the steamer, who were at the time, in special charge of the engine and navigation of the New England, and that the libellants, themselves, or some of them, were in said special charge of the engine and

navigation of the steamer. Secondly. That the respondents had delivered to Mr. Joseph Dorr, their agent, two packages of bank bills, one package containing bills of the Globe Bank, of Bangor, to the nominal amount of 20,000 dollars, and the other package containing bills of the Commercial Bank, of Bangor, of the nominal amount of 26,000 dollars, both packages being placed in one carpet bag, which was delivered with its contents to the clerk of said steamer, for safe keeping; that the said bank bills were comprehended in an agreement, subsisting between the respondents, and the said Globe and Commercial Banks, respectively, relative to the redemption of their bills, by which the said banks had been charged for the amount by the Suffolk Bank, and that the said bills, by the terms of such agreement were at the risk of said Globe and Commercial Banks respectively. Thirdly. That they do not admit, that the said Dorr made such offers of reward, nor any offer of reward, to the libellants as they allege, and that he was not authorized or empowered in behalf of the respondents, to promise such, or any reward whatever, for the recovery of said bills, or for any purpose whatsoever. Fourth. That the said steamer and property on board, were not abandoned by the officers and crew, as in the libel alleged, but, that from and after the collision, and until the libellants themselves finally left the steamer, the officers and crew thereof remained, and were on duty, on, or about that vessel, without abandoning the same, or any property on board; that the libellants, themselves, were acting under the orders of the captain, and other officers, and continued, and acted under such orders until long after the time of the services alleged in the libel. Fifth. That the libellants in the premises, were not acting in their private or individual capacity, but that said bank bills, together with other large amounts of bills, money and other property, belonging to various persons, were taken from said steamer by her officers and crew, only in discharge of their several duties, and to relieve themselves, and the owners of said steamer, from the legal liabilities which would have been incurred by the dereliction or loss of said property; that the same was done under the direction of the captain and other officers; that the said bills and other property being recovered were delivered to, and remained in the possession and control of the said captain and other officers, and were, afterwards, delivered by them or some of them, to the several owners, or to others for said owners, without any claim or pretence of claim by the libellants, or any of them, or by said officers, or others, of any right of salvage thereon; that the bills were delivered by the captain of said steamer, to the respondents, without any claim of salvage, or notice of such claim, or any allegation or pretence, that he, or any of the officers, or crew, had, in respect to said bills, done more or acted otherwise, than was re-

quired in the performance of their several duties, and for their protection and discharge from their legal liabilities. Sixth. That the motives, or inducement, by which the libellants were actuated, were not such as they allege, but that they acted as the respondents verily believe, in all the premises, only in performance of their several duties, and under the orders of the officers, and for earning, and securing their own customary wages; that the libellants, and each of them, in fact, claimed, and received, from the owners and officers of said steamer, their customary wages, for all said time, and until their arrival at Boston, the day following, as also all their wages at the time of the collision pending, or at any time earned; that the libellants were, thereby, fully paid for all services alleged or done by them, at the time aforesaid, and that they, nor any of them, ever made any or further claims upon said owners or officers, than for their wages so paid in full. Seventh. It is denied that the labor and risks incurred by the libellants, in the premises, were in nature or degree as in the libel alleged. They were, it is asserted, by the respondents, comparatively slight, in a very little (if any) degree, exceeding the common services and risks of seamen, the whole having been done in full daylight, and in a very short time, and in the particular mode pointed out by others; that the sea was calm, the weather pleasant, and numerous boats and assistants constantly at hand; that, in fact, equal or greater labor and risk were incurred by other persons than the libellants, on board and about the said steamer, who have made no claim for compensation. Eighth. That if the bills so saved, were in fact the property, and at the risk of the respondents, the saving was of no pecuniary benefit to them, the same being of known amount, and the whole matter capable of explicit proofs; that independently of the agreement with the Globe and Commercial Banks, the claim of the respondents, upon those banks, from which the bills had been issued, for the amount, would not have been defeated or affected, by the total loss of said bills. That in the event of such loss, the fact of the prior receipt of said bills by the respondents, and of their loss and destruction were capable of proof, and would, in fact, have been proved by the respondents, and that they would have been able to sustain their charges, for the amount, with interest against the said banks, and that the said banks, as the respondents have been assured, would have readily allowed said charges, without the production of the bills; that the said bills, when taken from the steamer, were saturated by the salt water, and greatly stained and injured, and that the fact of the loss of them would have been so notorious, that any attempt to pass them by any person who might have found them would have been unsuccessful, as they would easily have been identified as the lost bills; that the said banks which issued them, were in no danger of being compelled, nor would they have been liable to pay them, to any holders of them, and further that the bills of said banks, were at that time, generally uncurrent, and have so continued to the time of filing the answer of the respondents in this suit. Ninthly. That if the libellants can be considered as rightfully entitled to salvage in the premises, there were other, and large amounts of bills, and other property belonging to various persons, taken from the said steamer by the libellants, under the same circumstances, or other persons acting with them, and equally entitled to come in and claim with them, and that said other bills and property, or their owners, ought to bear or pay a contributing share of such compensation or salvage, as may be decreed. The proof in the case on the part of the libellants, is contained in the depositions of George Mesner, and James Collins, two of the libellants, and in the depositions of William Rush, William Griffin, Jason Collins, and Andrew McCausland, firemen on board the New England, at the time of the disaster, and of Isaac Powell, the cook. The respondents produce the testimony of Nathaniel Kimball, master of the New England, William L. Stone, the clerk, Joseph H. Dorr and Samuel G. Stimson, passengers.

The testimony is unusually voluminous, from the very extended and searching examination which was pursued by the contending parties, and is in some instances, not easily reconcilable. The following facts, however, are admitted, or satisfactorily proved: The steam packet New England, Nathaniel Kimball, master, sailed from Boston, on the 30th day of May last, bound to Bath and Gardner, on the Kennebec river, and between 1 and 2 o'clock, of the next morning, about 16 miles south from Boon Island light came in contact with the schooner Curlew, deeply laden with lime, bound for Boston, from an Eastern port, the steamer being under rapid way, at the rate of 12 miles an hour, impelled by her machinery in full operation, and with her sails set, a foresail and jib. The stroke was particularly severe in its effect on the steamer. A large hole, some of the witnesses say as large as a hogshead, was made in her bow, and in about twenty minutes she was filled with water. The alarm and dismay of all on board, as they rushed on deck, most of them aroused from sleep by the shock, was excessive. The vessel was fast settling, and, from a persuasion that she would soon sink, all applications for arresting the influx of water proving ineffectual, it was decided to take refuge on board the Curlew, a measure in which the master and officers of the steamer, and all on board concurred for the preservation of their lives. This was effected partly by boats, with which the steamer was well furnished, but principally, by immediate transit to the Curlew, which haled alongside, not having sustained any considerable injury by the concussion.

When the Curlew stood off, as she soon did, from apprehension of danger, if the steamer should sink, while attached to her, she had received on board all the passengers, sixty-three in number, excepting one, who was killed, (in what manner does not appear in the evidence,) and all the crew of the steamer, excepting Capt. Kimball, and some of his officers and men, who remained in the boats, and were actively employed in saving such baggage of the passengers and materials of the wreck, as were found floating, which they collected and delivered on board the schooner. Some time was spent in this operation, when it was perceived, that the steamer, instead of gradually sinking as was expected, became stationary. Hopes were then entertained, that she would not sink, and the appearances were so promising, that she would continue thus stationary, the weather also being clear and mild, and the sea smooth, that Capt. Kimball, and the men with him were encouraged to go on board the wreck in their boats, and to make an effort to save the baggage and other valuable articles, which might be accessible. At that time, the only part of the New England, above water, was the promenade deck, which the party in the small boats, or some of them, ascended, and forthwith proceeded to recover the baggage, breaking through the sky-light, beneath which was the baggage rack. In this, good progress was made, and the trunks, bags and other packages which were in this mode recovered, were sent in boats and delivered on board the Curlew, then standing off and on, at varying distances from the wreck. After a considerable portion of the baggage had thus been received and placed on board the Curlew, there appeared urgent motives that the Curlew should be relieved from her uneasy situation, and proceed to Boston, in contemplation of being replaced, for assistance to Capt. Kimball and the men remaining with him, by another schooner then nearly approaching them. Mr. Blanchard, first pilot of the New England, by appointment from Capt. Kimball, left the boats and went on board the Curlew, to take all proper charge of the property saved, and placed on board the vessel, and of that part of the crew of the New England, who were on board the schooner. The Curlew departed before sunrise, and was replaced by the schooner Evelina, of Portland. The recovery of the baggage through the sky-light aperture, was industriously pursued, and all or nearly all the remaining contents of the baggage rack, were saved, and conveyed in the boats to the schooner Evelina. This being accomplished the more difficult task remained, the recovery of the valuable property in the captain's office, which could only be effected by cutting a passage through the promenade deck. This was performed, by means of an axe, brought by Mr. Stone, the clerk, from the schooner Curlew, before her departure. From the opening thus made, there was fished up (as the witnesses expressed it) two carpet bags, one containing the packages of bank bills, which had been deposited by Mr. Dorr, with the clerk of the boat; the other holding the smaller amount of bank bills, belonging to Mr. Stimson. In this operation, the libellants were all actively and laboriously employed. The carpet bags, with their contents were delivered to Mr. Stone, and by him to Capt. Kimball, who was alongside in one of the boats; Mr. Stone was despatched with them to the schooner Evelina, and did not return again to the wreck. After his departure an iron safe, containing Capt. Kimball's money, about six hundred dollars in specie, was drawn up. The men next proceeded to save other articles of small value, such as the bell which they disengaged from its fixtures, and a portion of copper pipe, part of the machinery. "We supposed," says Capt. Kimball, "that we had saved everything that could be saved by the small boats, unless we had towed the steamer in." The men then left the wreck and repaired to the small boats, by direction or advice of Capt. Kimball, who appears to have been vigilantly attentive for the safety of all in concert with him in the undertaking, and who, after the saving of the articles mentioned, noticed some small change of position in the wreck, inducing him to advise the men to leave the wreck, and go into the boats. Soon after they left the wreck she turned bottom upwards. Capt. Kimball and the men with him, went on board the schooner Evelina, and proceeded in her forthwith to Boston. They had been employed in the service described about five hours. The re-entrance on board the steamer, was, as I should infer from the testimony, not far from the commencement of twilight. When the carpet bags were extracted from the captain's office, it was near sunrise, and the safe was drawn up, about an hour after sunrise. On arrival at Boston, the packages saved, belonging to the Suffolk Bank, were forthwith delivered to the proprietors, containing the whole amount of bills delivered by Mr. Dorr, to the clerk of the steamer, forty-six thousand dollars. At the time when the steamer, which it had been supposed would sink, became stationary, and the boats were about proceeding to go from the Curlew for the purpose of boarding her, Mr. Dorr, it appears from the evidence, made urgent requests, and large offers of pecuniary reward, first of $2000 and then of $5000 to those would save for him the packages of bills, which he had lodged in the captain's office. These offers it is testified were made in the hearing of the libellants, and received a reply from one of them, Mr. Mesner, that as to both sums, Mr. Dorr might as well offer the whole, for he must know that it could not be done. These asserted offers are denied by Mr. Dorr, who affirms, that he made no offer of any particular sum, but that he did promise a reward, and in presence of many

of the crew. Mr. Stone, however, testified that he was promised 1000 dollars, by Mr. Dorr, if he should succeed in saving his money; and so many witnesses testify to the offers of 2000 and 5000 dollars, made to those in the boats, that I am bound to believe, that some such offers were made by that gentleman, but made in such a state of anxiety and excitement, that the expressions which at such a moment escaped him, are not recollected. The libellants, with all the rest of the crew of the New England, received their wages, in full, on the 1st day of June, reckoned at their respective rates, up to that time, one day after the disaster. Receipts, in common form, were given by them, without claim or demand of any further compensation or allowance, excepting that one of the witnesses testifies that he did say, at the time of the payment of wages, that he thought he ought to receive something more. After that time and before the filing of the libel, Mr. Stone, in consideration of his services in the premises, received from the bank, three hundred dollars, through Mr. Dorr, their agent, for which he gave a receipt. This transaction was without any previous consultation with Capt. Kimball, or any of the other officers, or with any of the crew of the New England, none of whom have participated with Mr. Stone in that donation.

Have the libellants, from the facts proved, a legal claim in the application of the law marine to those facts, a right to any further allowance than the wages which they have received, and, if so, to what amount? If they are thus entitled, it must be as salvors, or by virtue of the offer or promises made by Mr. Dorr, agent of the Suffolk Bank, or on the ground of extraordinary gallantry and enterprise. The general rule of law, respecting salvage, excludes the ship's company. A salvor is a person, who, without any particular relation to a ship in distress, performs useful service, and gives it as a volunteer adventurer, without any pre-existing covenant that connected him with the duty of employing himself for the preservation of the ship. The Neptune, 1 Hagg. Adm. 236; Hobartsal v. Drogan, 10 Pet. [35 U. S.] 122. The allowance to be made to the crew of a vessel, for their services, is, in the language of our decisions, on the subject, denominated salvage, or more frequently qualified salvage or compensation in nature of salvage. The adjudications in England do not adopt the term salvage in reference to such services, but consider the requisite compensation as due by the contract. In our legal nomenclature, on this head, we have two descriptions of civil salvage; general salvage, to which the definition that has been cited is applicable; and special or qualified salvage. a remedy for seamen against property saved by their exertions from a ship to which they belonged. Such suit is ordinarily limited to wages due, but it is understood, that it is competent to the court to award additional recompense, in cases of ex-

traordinary danger and gallantry. The Two Catherines [Case No. 14,288].

In regard to wages, there is in this case, no question, the libellants having received their wages in full. Their claim for additional recompense, for extraordinary danger and gallantry, is reserved for separate consideration in another connexion. They cannot claim as general salvors, from their relation to the New England; being part of the ship's company, they are excluded by a rule of marine law, of ancient standing, approved acceptance, and of such familiar application, that the learned counsel at once yielded to its government for the exclusion of claim under that head, unless they should show that the libellants, according to the facts of the case, were in a position and character at the time of the alleged service, entitling them to be admitted as salvors, notwithstanding their engagements, as officers and men on board the New England. For this purpose it is contended in the first place, that the New England was abandoned, and derelict, and that the libellants' contract, in reference to service on board of her, was at an end; that the services which were rendered by them after she was first left, were purely voluntary, and could not be required by any duty incumbent on them under those circumstances. They allege, "that the passengers, captain, officers, and crew of said boat, within the space of thirty minutes after the collision, left the said boat under the apprehension, and expectation, that the said boat would go down, and went on board the schooner Curlew, with the intention to leave and abandon, and did leave and abandon, all further navigation of said boat." The navigation of the boat was abandoned, but the circumstances of the case do not present a case of derelict. The situation of the New England was deplorable but not desperate. She was left, indeed, by all on board, under an apprehension that she was sinking, but the master and a portion of the crew remained about her, in their boats, and very soon entered on board again, for saving the property of the passengers and owners as might be practicable. It would be carrying the doctrine of derelict to an undue extreme, to consider this a case of absolute abandonment. In the case of The Emulous [Case No. 4,480], in this particular of similar character, it was suggested that it was a case of derelict. But that ground was not sustained by the court, there being not only the animus revertendi, but the actual presence of the master when the salvage service was performed. Here was the actual presence of the master, through the whole transaction, in all its phases. Capt. Kimball appears to have been assiduously attentive, vigilant, and faithful in reference to his trust; he was not at any time on board the Curlew, and during the brief interval which elapsed before re-entering his vessel, being employed with the small boats about the wreck, and having improved the earliest moment while the vessel was under his watch,

to enter on board, when it could be with safety, the animus revertendi, may reasonably be presumed to have existed. The agency and exertions of the officers and men accompanying him must in my opinion be considered as under his direction, and, in performance of the duties which their obligation in connection with the New England, imposed. It is further argued in regard to two of the libellants, Mesner and Stillfin, that they held such official stations, in the employment of the steamer, one being second pilot, and the other first engineer, that they were not bound to the exertions, labor, and hazard, which are incumbent on seamen, in such emergencies, though the other two libellants, Collins and Goodin, may have been subject to the performance of such duties, arduous and severe as they may have been. Mesner and Stillfin, it is contended, are entitled to claim as salvors, on the same ground, as pilots are known to have been thus admitted.

The few cases, in which pilots have been admitted to share as salvors, rest on grounds which do not appear to me applicable in the present instance. "It is clear," says Judge Hopkinson, in the case of Hand v. The Elvira [Case No. 6,015], "that a seaman is much more closely bound to a ship than a pilot, and the duties to her are far more extensive, permanent and severe." Pilots, in ordinary navigation, are engaged occasionally, and for a particular service, and for the established reward for such special services; for extraordinary services, of another description, foreign to their line of duty, they have been considered to be entitled to claim as salvors. The pilot of a steamboat, is of a different character, he is one of the ship's company, and if styled sailing master, it would more fully and correctly indicate his line of duty. Ordinarily he satisfies all claims, by confining himself to his appropriate duties. But in trying emergencies, as in shipwrecks or in distress, or disaster at sea, he must, I think, from his intimate relation to the ship, be considered to be on a different footing from pilots in ordinary navigation, and to be holden to like exertions for preservation of life and property as if belonging to a ship's company in common navigation. So is it also with the engineers, or any other officers belonging to a steamboat, and with the whole crew. In some remarks which I have recently seen, respecting the anticipated extension of steamboat navigation on the ocean, the writer notices the effect of the "daring achievement," and of the application of a power "which takes the mind up from former associations." The animating views connected with these remarks, there is certainly no disposition to depreciate. But it must be remembered, that the extensive application of the new power, has its peculiar dangers, imposing corresponding duties, on those by whom it is exercised. In the dissipation of former associations, we are to take a sober view of probable contingencies, and be careful to retain the good old rules of the marine law, which have proved efficacious and salutary in the progress of navigation, and essentially subservient to the safety and security of all concerned. With these views I cannot but consider the claim of the pilot and engineer of the New England, of exemption from the legal duties belonging to a ship's crew, in cases of extremity, and to become general salvors, in consequence of holding those offices, not to be sustained. Those who may be about to embark in a steamboat, may reasonably be considered as entertaining no expectations of such exemption; and, if it were decided otherwise, masters and owners of steamboats, would probably find it expedient, to ensure confidence and custom, by express stipulations, publicly announced.

On the same ground that the libellants are incapacitated, by law, from being general salvors, rests the invalidity of the promise, or offer made by Mr. Dorr. In the case of Harris v. Watson, Peak, Cas. 72, a promise made by the master of a ship, of extra wages, in a case of extremity, was held not to be binding, on principles of general policy. "If this action was to be supported," says Lord Kenyon, "it would materially affect the navigation of this kingdom." Neither as I conceive, will the law enforce a promise of pecuniary reward made by a passenger to one or more of the crew of the wrecked vessel, for the purpose of engaging him or them to his particular interest in such a season of general calamity. If the libellants could be considered as general salvors, any promise of pecuniary reward would be of little or no importance. It might be too much or too little. The court would in such case adjust the reward according to merit and benefit. Being as they are deemed to be, not general salvors, but engaged in saving the property conformably to their duties, they were not at liberty to place themselves under engagements which an admission of the validity of the promise would import. Capt. Kimball, I conceive, could not legally act under a promise of this description, neither could any under his command. The preferences which such engagement would involve, are inadmissible.

In regard to the pecuniary loss, which one of the libellants, Mr. Mesner, asserts that he sustained, it is not alleged in the libel nor is it duly proved, and if the sum mentioned were in his chest, at the time, the loss cannot be imputed to his attention to saving the property in the captain's office. There was ample time, after he entered on board before the opening was commenced into that office to repair to his berth, and save any valuable articles which it contained, if it were practicable. I cannot but conclude therefore, that the berth, which was forward, was entirely under water, and inaccessible; and that his failing to resort to it, for saving his property,

in that place, was from its impracticability, and not occasioned by his devotion to saving the respondent's money.

In regard to the only remaining ground, taken in support of the libellants' claim, that of deserved recompense for extraordinary danger and gallantry, it is readily conceived how those characteristics should lead to augmentation of compensation, in awards for salvage service, and the American authorities distinctly authorize an allowance, for such cause, in the salvage suits by seamen, on account of property saved by them from the wreck of a vessel to which they belonged. There would seem, indeed, to be a difficulty in reconciling an allowance of this description, in addition to wages, with the strong language of the maritime law, in reference to the seaman's duty on such occasions. He is required as has been repeatedly decided, and as the digests on the law of shipping repeat, to exert himself, to the utmost, to save as much as possible of vessel and cargo, in terms so intense, as would seem to embrace any services comprehended under the expression cited in support of this claim. Lord Stowell, in the case of The Neptune, emphatically states the inconveniences and embarrassments, from suits of this description, for an unliquidated sum, "the one party hardly guessing what is proper for him to ask, and the other equally ignorant what he ought to refuse, and the court having to find the proper liquidation, often on evidence sworn to, on both sides, with equal intrepidity." These remarks of that distinguished jurist, are entitled to serious attention, but the law as declared by our own courts is to be taken, for guide and government on the subject. Lord Stowell would limit the compensation in such cases, to the wages; our decisions are of more extensive import, and authorize a recompense in addition to the wages. In connexion with a distinct declaration of this doctrine, in the very instructive case of The Two Catherines [supra], the court appears to have in a degree anticipated the difficulties, which so strongly impressed the mind of Lord Stowell two years afterwards in the case of The Neptune. "It appears to me," says Mr. Justice Story, "that there is sound policy and wisdom in fixing in ordinary cases of this sort a settled salvage, at least to the extent of wages earned, leaving an additional recompense to be made in cases of extraordinary danger and gallantry, where the service is greatly enhanced by the preservation of life and the great value of the property at stake." There are exceptions, according to frequent decisions, to the general rule, which precludes seamen from being admitted as salvors, in reference to the vessel to which they belong or its cargo. Such is the case of recapture of their vessel, a dangerous service, which they are not bound to perform, and their contract being dissolved or suspended by capture. In the instance of Toole in the case of The Blaireau, "the captain," says Chief Justice Marshall, "who was entrusted by the owner, with power over the vessel and her crew, had discharged him from all further duty, under his contract, so far as any act whatever could discharge him." The distinction prevailing, in cases of such description, is, that there is a change of state or condition, but where the service is merely heightened in degree, being in the performance of the duties required by the mariner's engagement, there is, manifestly, opened a wide field for claims and controversies, requiring, if practicable, some definite limits, though it may be difficult to assign them. In the case of The Two Catherines the limit recommended in ordinary cases is the amount of wages due, an additional recompense to be decreed for extraordinary merits. Where the wages have been paid, I am not prepared to sustain a separate suit against individuals, passengers or shippers, whose property may have thus been saved. When an allowance is made, on that ground, in connexion with a suit for the wages, it is admissible, by analogy with the reward allowable in such case for the preservation of life, for which a separate and distinct demand cannot be maintained. In a salvage suit, where such claim for extra allowance is associated with the claim for wages, admiralty rules and practice are well adapted to bring all parties and interests before the court, and to comprehend the entire merits in one decision. But the party is not, I think, at liberty to break his case into fragments, and after wages are received, to maintain separate suits against individual owners of property saved for such extra allowance. On this ground, the libellants having received wages without claim of any further demand, cannot in my opinion, legally maintain this suit.

If the case were free from this objection, I am not satisfied, that the facts in evidence would sustain the claim which is made. The services rendered by the libellants, were, indeed, prompt, energetic and efficient, and the value of the property saved, for the respondents, cannot, I think, be reduced to the low estimate, expressed in their answer, and in the arguments of their counsel. But the time employed by the libellants was brief, and considering the mildness of the weather, the smoothness of the sea, the number of boats well manned, which were around the wreck, under the direction of Capt. Kimball, whose vigilant attention to the safety of the men employed was in constant exercise, they were not, as appears to me, in any very imminent danger. The most alarming apprehension, probably, was the fall of the steam-pipes. This it appears engaged the particular attention of Capt. Kimball. He directed the rods, on one side to be loosened, to secure the expected fall in a safe direction. This, he says, was done, and the steam-pipes fell without injury to any one. The men, says Capt. Kimball, "worked jovially;" by which I understand, that they worked with alacrity,

without fear, and with that hilarity which is usually the happy accompaniment of strenuous action in the performance of duty. It is to be considered, however, that if their services should be estimated as of a high order, that they were under peculiar obligations to extraordinary exertion to save the property of the passengers, considering the character, and origin of the disaster. There is presumptive evidence, that the steamer was at fault, in the collision, from want of due vigilance or attention by those who had her in charge at that moment. It is certain that such was the impression of the passengers, generally and emphatically expressed. Under such circumstances, the officers and crew of the New England were bound to the utmost exertions, after the passengers were placed in safety, to save their property. If the effect of the concussion had been reversed, and the Curlew had been the sufferer, and had been laden with valuable commodities, no one, I think, will say, that the officers and crew of the New England, could legally or reasonably claim pecuniary compensation for the relief that they might afford in such extremity, which their vessel had been instrumental in producing. In the actual event of the shock, they were equally bound to render all practicable aid, for the preservation of life and property intrusted to their care, and without demanding extraordinary reward for their exertions. Such, indeed, it is believed, was the spirit with which the libellants were actuated.

Remarks were made in the argument, relative to their motives, in their proceedings, and it was inferred that in the saving of the money from the captain's office, they were not influenced by the promise of reward, made by Mr. Dorr. Their motives, I should say, were probably various. They were told repeatedly, that the payment of their wages depended on saving the captain's money, contained in the iron safe. This, it may be presumed, had its influence. That they were not primarily prompted by Mr. Dorr's offers, would appear from the fact, that they did not forthwith employ themselves in recovering the property in the captain's office; but, very properly, began their labors in saving the contents of the baggage rack, by the opening at the sky-light. Their prevailing motive, may be considered to be a sense of duty, and respect to the orders and influence of their superior officer.

The bounty of the bank to Mr. Stone, probably produced new views and determinations in the minds of those who thought themselves equally entitled to reward. That gratuity, has no legal bearing on the case before me. If previously to that bestowment, Captain Kimball had been consulted, in regard to the application of such donation as the respondents might be willing to grant, or if the libellants themselves had made a claim on the bank, prior to the payment made by Mr. Stone, distribution might perhaps have been

made, obviating all umbrage, and preventing the institution of this suit.

Such are my views of this case, and the libel will be dismissed. It is a relief to know, that, if the decision be erroneous, the libellants have their remedy by appeal, in the result of which any mistakes in matters of law, or in the application of law to the facts, may be corrected. Libel dismissed. It is understood that costs are not claimed for the respondents.