## Case No. 10,490.

### The OLIVE BRANCH.

[1 Lowell, 286.] [1]

District Court, D. Massachusetts. Nov., 1868.

SALVAGE—WHEN CREW CAN BE SALVORS—ABANDONMENT BY MASTER—LOCAL USAGE REQUIRING MEN TO ASSIST IN UNLOADING FISHING VESSEL.

1. The crew can be salvors of their own vessel when their contract has been put an end to, either voluntarily by the master, or as the effect of a vis major.

[See The Antelope, Case No. 484.]

2. But where the crew were abandoned by the master, near the home port, and the vessel was soon afterwards stranded, and there was no mate, and the men got the ship off the shore and saved her with considerable difficulty and danger, held, they were not salvors.

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

3. A local usage to require the men to stay by a fishing vessel till she is unloaded and cleaned, in her turn, will not authorize the owners to claim a deduction from the wages of the men who have not assisted in this work, if they were not asked to stay for this purpose, and the custom was merely made use of to cheapen their demand for wages.

4. Quære, if a usage to wait for an indefinite time until the owners are ready to discharge the vessel is valid?

Five seamen of this schooner proceeded for their wages and for salvage. Their contract was to carry on the bank and other cod fishery from Plymouth during the season, and to make two trips, if the owners should wish to make so many, for round sums of money for the season. The schooner was a large one, and her first trip lasted until the early part of September. The master on his return anchored the vessel near Yarmouth, some twenty miles from Plymouth, and left the vessel towards night, taking with him the two sharesmen; and it was admitted that he did so without right, and in pursuance of a purpose to defraud the owners, some of whose property he had embezzled. A storm was even then rising, and in the course of the night the vessel was stranded. The libellants stayed by the schooner, and on the next day, with much labor and danger, and some privation, succeeded in getting her afloat, and pumped out in Yarmouth harbor. They were without officers, for no mate had been connected with the schooner. They telegraphed to the owners at Plymouth, and a man was sent who took command, and the vessel was taken safely to Plymouth and anchored near the claimants' wharf on Sunday. The libellants asked for their wages more than once; and on Wednesday or Thursday the owners offered to pay them if they would deduct ten dollars each, which they refused. Some of them afterwards offered to take off five dollars, but this offer was not accepted. The owners testified to a custom at Plymouth, for all seamen of fishing vessels who do not expressly stipulate to the contrary, to stay by the vessel until the fish are washed and the vessel fully discharged and cleaned, and that if the same owners have other vessels which are being discharged, the regular turn must be taken for the vessel in question. That in this case there were one or more vessels of theirs which had priority, and that some time would elapse before the Olive Branch could be unloaded. By way of set-off for this remaining duty the owners asked for this reduction. The libellants demanded not only full wages but salvage.

C. G. Thomas, for libellants.

W. D. A. Whitman, for claimants.

LOWELL, District Judge. Seamen may be salvors of their own ship when their contract has been dissolved, either voluntarily by the master or by the effect of a vis major. Mason v. The Blaireau, 2 Cranch [6 U. S.] 240; The Triumph [Case No. 14,183]; The Flor-

ence, 16 Jur. 572; The Warrior, Lush. 476. That this point may be one of some nicety, will be seen by comparing the case of The Triumph, ubi supra, with that of The John Perkins [Case No. 7,360]. In this case I am obliged to say that the conduct of the libellants, courageous and meritorious as it was, does not bring them within the law of salvage, because their voyage was not ended, nor their contract in any way annulled or dissolved. The master had left them, and it happened, from the nature of the voyage, that they had no mate; but the desertion had no reference to the approaching storm, and I regret to say that I cannot distinguish the case from one in which the master should have lawfully gone on shore, leaving these men in charge, or should have been lost overboard. I do not, of course, mean to be understood that where a ship at sea is deprived of her officers. and the men, or some of them, are competent to navigate the ship, and do supply the place of officers, they would not be entitled to extra compensation, but it would probably not be a salvage reward, and the evidence here does not enable me to ascertain any such service. Whether the action of the owners has been either generous or even gracious, I have no jurisdiction to determine.

Upon the question of wages, it appears that the owners did not desire to make a second trip, though perhaps the season was not so far advanced that they might not have required the men to go again under their contract; the dispute is upon the alleged usage. The libellants were shipped at Boston, and some of them had sailed but seldom from Plymouth or its neighborhood. They deny knowledge of the custom set up, and say that so far as they know, the usage is to wash the fish only when that service is expressly mentioned in the articles. The claimants are likely to be better informed on this subject, and the preponderance of the evidence is that such a usage exists. It is analogous to the general rule applicable to other voyages, unless when varied by contract or usage, that the seamen are to stay by the vessel until the cargo is unladen.

But it is clear that, in this case, it was for the interest of both parties that the men should be discharged when they were discharged. The vessel would not be unloaded and cleaned for an indefinite period, has not in fact been cleaned yet, some six weeks after her arrival; the board of the men would have come to much more than their services would be worth. One of the owners said very frankly that he considered it for the benefit of both parties that the men should be discharged on the Thursday, but that it was usual for them to make a discount when that was done, and this voyage having turned out ill, the saving was of some importance to the owners. It does not appear that the owners asked the men to stay; but. on the contrary, they were quite ready to have them go, upon terms. They told them why they asked the discount, but beyond that made no claim, but rather encouraged the belief that they would settle with the men. I cannot regard this conduct as quite ingenuous. The men may have been deceived by it, and have understood, as the fair result of the interviews, that there was no question at all of their staying, but only upon what terms they would go. I so understand the matter myself as developed by the evidence. Under these circumstances equity requires me to regard the contract as ended by the consent of both parties; and as the owners have made no loss by its termination, I shall make no deduction from the wages. It is well understood that after a voyage is ended no statute desertion can take place; but a refusal of duty even then may lead to a diminution of wages by way of penalty; but the facts do not authorize the imposition of a penalty here.

It may be doubted whether a usage to detain the crew for an indefinite time, in the discretion of the owners, would be valid. Decree for full wages.