## THE C. P. MINCH.

## TALBERT et al. v. ELPHICKE et al.

### (Circuit Court of Appeals, Second Circuit. April 7, 1896.)

1. SALVAGE—SERVICES OF MEMBERS OF CREW—SHIPWRECK AND ABANDONMENT.

In every case where compensation in the nature of salvage has been awarded to seamen, either the voyage has been terminated by shipwreck, or the ship has been abandoned by all, or by all except the salvors, under circumstances showing conclusively that the abandonment was absolute, without hope or expectation of recovery, or that the seamen had been by the master unmistakably discharged from the service.

2. SAME.

A schooner was anchored near shore on a dark, squally night, in a heavy sea, when, by a change of the wind, she was swung round towards the shore, so that she began pounding on a sandbar, and dragging her anchor. The master directed the yawl boat to be lowered, and told the crew to get ready to go ashore. The mate, cook, and one seaman refused to go, and were left on board. On reaching the shore, the master went for a tug, which agreed to go out next morning. After he had left, the mate took soundings, found deeper water towards the stern, and let out the anchor chain until the schooner was in deep water, where she rode quietly until morning. The master then rejoined her, and the voyage was completed, and wages paid to the crew. *Held*, that there was no evidence of a final abandonment of the schooner by the master, and that those who remained on board were not entitled to salvage. 61 Fed. 511, affirmed.

Appeal from the District Court of the United States for the Northern District of New York.

This libel was brought by the mate and a seaman, being two of the crew of the schooner C. P. Minch, to recover salvage compensation for services rendered during a voyage from Portage Entry, a port on Lake Superior, to Buffalo, N. Y. The voyage was completed, neither the vessel nor her cargo of stone sustaining loss or damage, and libelants, with the rest of the crew, paid off in Buffalo. The facts upon which the claim for salvage is based are stated in the opinion. The district court, Northern district of New York, dismissed the libel (61 Fed. 511), and libelants have appealed.

Geo. S. Potter, for appellants.

Geo. Clinton, for appellees.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. The general rule of law governing claims of this character is thus stated by Mr. Justice Story, delivering the opinion of the supreme court in Hobart v. Drogan (The Hope), 10 Pet. 108:

"Seamen, in the ordinary course of things, in the performance of their duties, are not allowed to become salvors, whatever may have been the perils or hardships or gallantry of their services in saving the ship and cargo. We say in the ordinary; for extraordinary events may occur, in which their connection with the ship may be dissolved de facto, or by operation of law, or they may exceed their proper duty, in which cases they may be permitted to claim as salvors."

It is provided in Act June 7, 1872, §§ 32, 33, now sections 4525, 4526, Rev. St. U. S., as follows:

"Sec. 4525. No right to wages shall be dependent on the earning of freight by the vessel; but every seaman or apprentice who would be entitled to demand and receive any wages if the vessel on which he has served had earned freight, shall * * * be entitled to claim and recover the same of the master or owner in personam, notwithstanding that freight has not been earned. But in all cases of wreck or loss of vessel, proof that any seaman or apprentice has not exerted himself to the utmost to save the vessel, cargo, and stores, shall bar his claim.

"Sec. 4526. In cases where the service of any seaman terminates before the period contemplated in the agreement, by reason of the wreck or loss of the vessel, such seaman shall be entitled to wages for the time of service prior to such termination, but not for any further period."

This legislation relieved seamen from the operation of the harsh rule that payment of their entire wages was dependent on the earning of freight, although the catastrophe occurred near the end of a long voyage. Before its enactment, courts had frequently held that where, under the operation of the rule, wages, as such, could not be recovered, a sum equal to their wages might, in proper cases, be allowed to the seamen. Some cases justify this allowance as an exception to the rule that "freight is the mother of wages"; but in other cases it is referred to as a sort of qualified salvage. The Neptune, 1 Hagg. Adm. 236; The John Taylor, Newb. Adm. 341, Fed. Cas. No. 2,482; The Two Catherines, 2 Mason, 319, Fed. Cas. No. 14,288; The John Perkins, 21 Law Rep. 91, Fed. Cas. No. 7,360; The Dawn, 2 Ware, 126, Fed. Cas. No. 3,666. And there are cases in which seamen have been awarded an amount of salvage greater than their lost wages. A brief statement of the circumstances under which such awards, whether equal to or in excess of wages, have been made, and of the circumstances attending certain cases where they have been refused, will best indicate what merit there is in the libelants' claim in the case at bar. Probably, the following enumeration does not include all the cases in which such awards have been made to seamen, but it does include all to which either counsel has referred, and all which, within the brief period at our disposal, we have been able to discover:

In The Neptune, 1 Hagg. Adm. 236, the ship was driven by a gale on to the French coast, stranded, and broken up so that only a small part of the ship, and no part of the cargo, could be saved. For most meritorious services after the voyage came thus to an untimely end, the seamen were awarded their wages.

In Taylor v. The Cato, 1 Pet. Adm. 48, Fed. Cas. No. 13,786, Warder v. La Belle Creole, 1 Pet. Adm. 31, Fed. Cas. No. 17,165, and Weeks v. The Catherina Maria, 2 Pet. Adm. 424, Fed. Cas. No. 17,351, the vessel foundered at sea, the crew and part of the cargo being saved by another vessel.

In Adams v. The Sophia, Gilp. 77, Fed. Cas. No. 65, the brig was wrecked near the Capes of the Delaware; vessel and cargo a total loss, but some of the rigging and spars saved.

In The Dawn, 2 Ware, 126, Fed. Cas. No. 3,666, the vessel was gotten into Bermuda, but in so damaged a condition that she was sold as a wreck. The court allowed wages and expenses home.

In Cartwell v. The John Taylor, Newb. Adm. 341, Fed. Cas. No.

2,482, the vessel was wrecked on the south coast of Cuba; a total loss, some part of her tackle, apparel, and furniture only being saved.

In The Two Catherines, 2 Mason, 319, Fed. Cas. No. 14,288, the vessel was shipwrecked in Narragansett Bay, and soon afterwards sank; the crew saving only a part of the sails, rigging, cables, and appurtenances.

In The Triumph, 1 Spr. 428, Fed. Cas. No. 14,183, the vessel was in collision off Cape Cod. The master and all the crew rushed on board of the colliding vessel, except libelant (the cook), who was asleep below. By the time he got on deck, he saw the last of his shipmates climbing aboard the other vessel. He hailed and begged to be taken off, but the master of the other vessel refused to wait, although the master of the Triumph begged him to do so. The libelant rigged the pump, found the leak, patched it up as well as he could, and managed to navigate the vessel after a fashion until another vessel came to his assistance. He was awarded salvage beyond the amount of his wages.

The Le Jonet, L. R. 3 Adm. & Ecc. 556, was also in collision. All but the mate escaped to the colliding vessel, which bore away. The mate got Le Jonet before the wind, and kept her so for some hours, till the wind moderated, when he laid the vessel by the wind, and hoisted a signal for assistance. She was sighted and taken in tow by a steamer, the mate steering her, and brought into Hull, with eight feet of water in her hold. Sir Robert Phillimore held that the contract of the mate had been dissolved, because of the final abandonment of the ship by the master and all the crew, except the mate, who voluntarily stayed on board, and awarded him full salvage for meritorious services.

The crew of The Olive Branch (1 Low. 286, Fed. Cas. No. 10,490) were abandoned by the master, who deserted near the home port. She soon afterwards stranded. There was no mate, and the men got the ship off shore, and saved her, with considerable difficulty and danger. Judge Lowell, however, held that they were not salvors; evidently on the ground that their contract was not terminated, either by discharge or by abandonment of the vessel, for the master's departure had nothing to do with the coming storm, and the case was the same as if he had lawfully gone ashore, leaving the men in charge, or had been lost overboard.

In Newman v. Walters, 3 Bos. & P. 612, the ship Betsey struck on the rocks off Chichester. Being in apparent danger, the captain got into the pinnace with three of the crew, and made his escape. The pilot was drunk. The mate and the rest of the crew requested plaintiff, a free passenger, who had been a sea captain, to take charge. He did so, and was awarded salvage, because he was a passenger. Lord Alvanley says:

"The crew, indeed, ought not to desert the ship so long as they can possibly remain on board; and, if the mate in this case had saved the ship by doing what the plaintiff did, he would not have been entitled to claim a compensation in the nature of salvage."

In The Aguan, 48 Fed. 320, the steamship stranded on Roncador Island, and became a total loss. The chief officer and 4 men went in a boat to Corn Island for a small steamer, which came and took the passengers and 31 of the crew to Greytown. All hope of saving the Aguan was abandoned. The small steamer would not take any more, and the captain and 7 men were left on Roncador Island, to guard some specie still on the wreck, and wait for the return of the steamer. She did not come. A storm threatened, and it became apparent that the Aguan was about to break up. They took the specie ashore, and, the steamer not arriving in three days, they got a small sailboat, and carried the specie to Greytown. They were awarded salvage.

In the case of The Blaireau, 2 Cranch, 240, the ship, on her voyage from Martinique to Bordeaux, was at 10 o'clock p. m. run down by a Spanish man of war, which inflicted serious injuries on and about her bow. Before morning there were $3\frac{1}{2}$ feet of water in the hold, and the Spanish commander, not being able to wait for an attempt to repair her, took her crew and passengers on board his ship, excepting one man, Thomas Toole, who was prevented from going into the first boat, and afterwards refused to go in the second boat. Toole, by cutting away the anchors and bowsprit, which had been left hanging, lightened her bows, put her before the wind, and hoisted a signal of distress. In this situation she was found the next day by another ship, and eventually brought into port. It was held that he had been discharged from all further duty under his contract, so far as any act whatever could discharge him, when he and the vessel were abandoned by the master and crew in mid-ocean, to the mercy of the waves, and he was awarded full salvage.

The Umattilla, 29 Fed. 252, ran upon a rock on an inhospitable coast near Cape Flattery, many miles from succor. She was stove in. Upon taking off the fore hatch, the hold was found to be full of water, and it was supposed she would sink the moment she slid off the reef. The master and crew abandoned her absolutely. The mate and two seamen voluntarily remained on a life raft in the vicinity of the vessel. The captain and the rest of the crew reached the mainland about an hour and a half from the time they left the ship, which was lost to sight, by reason of the falling snow. Subsequently, the steamer slid off the reef, and the party on the raft, perceiving that she was not sinking, boarded her, and got her under way for the Columbia river. With the assistance of a steamer subsequently encountered, the vessel reached Esquimalt Harbor safely. In deciding that the mate and his companions on the raft were entitled to salvage, the court says: "No one, not even the salvors, appears to have entertained a hope that the ship could be saved,"— and reached the conclusion, which the evidence fully justified, that the master and crew quitted the ship without any hope of saving her, and with no intention of returning to and resuming possession of her.

In Mesner v. Bank, 1 Law. Rep. 249, Fed. Cas. No. 9,493, the steamer was in collision, and began to sink. Some of the crew es-

caped on the colliding boat. Others got into small boats, and lay alongside. Subsequently the engineer got aboard her with an ax, cut a hole in the promenade deck, and got $46,000 out of the captain's office. When he left the steamer, the water was over the guards. The court, by Davis, District Judge, says:

"The navigation of the boat was abandoned, but the circumstances of the case do not present a case of derelict. The situation of the New England was deplorable, but not desperate. She was left, indeed, by all on board, under an impression that she was sinking; but the master and a part of the crew remained about her in their boats, and very soon entered on board again, for saving the property of the passengers and owners, as might be practicable. It would be carrying the doctrine of derelict to an undue extreme to consider this a case of absolute abandonment. The Emulous, 1 Sumn. 207, Fed. Cas. No. 4,480."

The Florence, 16 Jur. 572, met with bad weather, and was abandoned in the Bay of Biscay, by order of the master. All went aboard the steamer Montrose, and were landed at Vigo. The British consul put them on another steamer, for conveyance to England. They fell in with the derelict. The mate and part of the crew volunteered to return to her, and, with the help of others, brought her to Corunna. Salvage was awarded to them by Dr. Lushington, who, on the subject of abandonment, uses language which will be found to be quite pertinent to the facts in this case:

"First. The abandonment must take place at sea, and not upon a coast; for, if a ship be driven upon a coast, and becomes a wreck, and the mariners escape to the shore, the contract inures to this extent, at least, that if they act as salvors, and successfully, so as to save enough to pay their wages, they will be entitled to them, though not to salvage. If they do not so exert themselves, their wages are lost. * * * I use the words 'at sea' emphatically, for I hold there is a very wide distinction between an abandonment at a distance from land, in the open ocean, and the quitting of a ship on the coast, where there may exist a fair expectation of returning, where the spes recuperandi is probable."

The facts in the case of The John Perkins, 21 Law Rep. 87, Fed. Cas. No. 7,360, were as follows: A fishing schooner, called the Wyvern, and three other vessels, including the John Perkins, were accidentally inclosed in a large field of ice, which extended along the shores of Massachusetts Bay. Though the vessels were imbedded, the field of ice was moved by the wind and sea. In this condition these vessels remained for several days, drifting helplessly with the field of ice, which was constantly becoming thicker and more dangerous, by the piling of masses on each other, which the intense cold at once rendered solid. The crews became alarmed for their own safety. On Saturday, February 11th, the crew of the Wyvern, with the exception of one Nickerson, left her, and went ashore, over the ice. Nickerson thought this attempt more dangerous to him than it was to remain on board, and he therefore remained. About noon of Sunday, the 19th, the crew of the John Perkins left her, and went, first, on board the Acorn, one of the other vessels inclosed in the ice, and, during the afternoon, went on shore, together with the crews of the two other vessels, deeming it to be hazardous to life to remain. The wind was blowing a gale, and there can be no doubt that the condition of all the vessels was one of extreme peril. Sub-

sequently, a collision between the John Perkins and the Wyvern, which would probably have caused the destruction of both vessels, was prevented by the act of Nickerson, who cut the cable of the Wyvern. Of the claim that Nickerson was to be considered a salvor of the Wyvern, Mr. Justice Curtis says:

"Though the master and crew of the Wyvern temporarily left the vessel, under the pressure of the danger arising from the force of the wind, it was their intention to return on board; and, though they undoubtedly considered the danger imminent, there is no reason to say, upon the evidence, that they thought the condition of the vessel hopeless. They not only intended to return, but expected to return. And they at no time were far enough distant to lose sight of the vessel in the daytime, or to be unable to return promptly when the gale should abate. This was, therefore, not any case of a derelict vessel; nor were those of the crew who went on shore, or the libelant [Nickerson], who remained on board, absolved from their duties as seamen; the latter to do anything which he might find practicable for the safety of the vessel while he remained on board."

Of this case of The John Perkins, Judge Sprague, delivering the opinion in The Triumph, supra, says:

"The master and all her crew but one left her by reason of danger from the ice, with the intention of watching her from the shore, to contribute to her preservation as far as might be in their power, and to return to her if practicable, and they actually did return to her. None of the seamen were discharged. They were allowed by the master the option of going ashore for the time being, or of remaining on board. One chose to remain, but all continued under his authority and subject to his command."

The Acorn, 3 Ware, 98, Fed. Cas. No. 10,252, was one of the boats imprisoned in the same field of ice as the John Perkins. Libelants were two of the crew who remained on board after the rest of the steamer's company had gone on shore. It was held that they were "not absolved from their contract."

Upon the question as to what is sufficient evidence of abandonment, reference may be had to Clarke v. The Dodge Healy, 4 Wash. C. C. 651, Fed. Cas. No. 2,849, which in some respects resembles The John Perkins, supra. She was caught in a solid cake of ice in Delaware Bay, and drifted down in the direction of the Cross Ledge Shoals, where she was abandoned by her pilot officers and crew, who came on shore at Ben Davis' Point, bringing with them, in their boats, their colors, compass, quadrants, clothes, bedding, and other articles, as many as the boats would stow. This was by the pilot's orders (the master was temporarily absent, in Philadelphia, and the first mate in command), and was induced by the apprehension that she would drift upon Cross Ledge Shoals, and be cut to pieces, or overwhelmed by the ice. The pilot, while expressing his apprehensions, added that, if she should escape drifting on the shoals, she would return with the tide the next morning, nearly to the same place where they then were; when the officers and crew could return to and take possession of her. Certain oyster men boarded the deserted vessel, and began operations to save her. Thereupon the mate, with four or five volunteers, returned to the brig, but was told by the oyster men that they had, and meant to hold, possession of her. The mate then left. The brig was subsequently saved. There was no question in this case of seamen's salvage, but the court dis-

cusses the subject of abandonment. It is suggested that, when such a question arises, one's actual intention is best determined by acts, rather than by declarations, contemporaneous or subsequent. After discussing all the facts, Judge Washington says:

"I am, in short, quite satisfied that an abandonment of the brig, without the intention to return to her in case she should escape the danger that threatened her, was at no period of time in the contemplation of the mate; and that, when he spoke of her being abandoned, he was far from annexing a technical meaning to the phrase, but merely intended to express the danger he apprehended her to be in, and his abandonment of the possession of her until the danger should be over, or should appear to be less imminent. I consider the brig as having at no period of time been out of the constructive possession of the owners. * * * She was deserted on account of an immediate danger, and only during such danger; but animo revertendi if the danger should pass away. She was watched by the mate, and was always in his view whilst on shore."

The Warrior, 1 Lush. 476, is an instructive case on the subject of discharge. The ship went ashore on a rocky beach in the Canary Islands, beat heavily, and in half an hour filled with water. The master and crew immediately quitted her, and went ashore. The next day, the master formally, in writing, discharged all officers and crew. Thereafter, some of the crew, at the suggestion of the mate, returned to the ship, and, by working for several days, succeeded in saving part of the ship's stores and a considerable amount of cargo. The ship was broken up. The court held that there was no abandonment, but that, although there was some doubt if the master was justified in discharging the officers and crew, still, since there was no evidence of collusion between them, and he did in fact discharge them, their contract should be considered terminated, and they were held entitled to salvage.

From this review of the authorities, it is apparent that, in every case where compensation in the nature of salvage has been awarded to seamen, the voyage has terminated by the shipwreck of the vessel, which has either gone to the bottom or left her bones on the shore, or she has been abandoned by all, or by all except the salvors, under circumstances which show conclusively that the abandonment was absolute, without hope or expectation of recovery, or the seaman has been by the master unmistakably discharged from the service of the shipowner.

The facts in the case at bar are as follows: The schooner sailed from a port on Lake Superior for Buffalo. When she had reached a point on the lake about abreast of No. 10 Life Saving Station, the wind was blowing a gale from the southeast; whereupon her sail was shortened, and her course directed towards White Fish Point. She dropped anchor under the lee of the point, less than a mile from land, in 4½ fathoms of water, the vessel drawing 13 feet. A short distance from her, and between her and the land, there was a gravelly, sandy bar, where the water was shoal. Towards midnight the wind died down, the glass fell, and everything indicated a coming storm. About midnight the wind veered to W. N. W., blowing hard. This put the schooner off a lee shore. A heavy sea arose, and the night was rainy, dark, and squally. The schooner swung around

towards the shore, dragging her anchor, until she reached and commenced to pound upon the bar. The master directed the yawl boat to be lowered, and told the crew to get ready to go ashore. All these facts are undisputed. There is a conflict of testimony between the captain and the mate as to exactly what conversation passed between them. The mate insists that the captain told him to get his bag, and get into the boat, as they were going to leave; that he refused, replying that he was going to stay aboard as long as she stayed together, to which the captain replied that he was a very foolish man, and would probably drown himself. All this the captain explicitly denies, and it is not material one way or the other. The utmost that can be claimed for it is that the master was alarmed for his own safety, as well as for that of the others on board, and thought the wiser course would be for all to go ashore, instead of remaining aboard throughout the night. The master and three of the seamen thereupon took some of their clothes and effects, got into the yawl boat, and went ashore. The mate and the other libelant, besides the cook and two passengers, remained on board. It appears that, had all embarked in the yawl, the risk of individual shipwreck was probably greater than if some of them remained on the schooner, because, although her situation on a lee shore, with a sandy bar under her, upon which she was beginning to pound, was naturally an unsafe one, which would expose her, should the gale increase without any change in the direction of the wind, to the risk of being cast ashore, it was not imminently perilous. The mate testifies that, at the time the others left in the boat, he was not terrified, because there was nothing to be frightened at; that he thought she could be saved; and that, "if a man worked right, she could be got off." After the boat had left, the libelant Talbert took soundings, and, discovering that there was deeper water astern and amidships, gave the schooner more chain, the vessel swinging over the bar into deeper water, where she was held by her anchor, riding out the gale until daylight. Early the next morning, a tug appeared. A line was passed to the schooner, and, with the tug's assistance, the vessel moved slowly out onto the lake, where, sail being made, she cast off from the tug. The libelants then started for the Sault, and the tug went into White Fish Point, whence she soon returned to the schooner, with the captain and the other three seamen. This same tug was lying under the lee of the point when the schooner first came to anchor, and her presence there was noticed by the captain and others. When the wind shifted during the night, the tug steamed around to the other side of the point, where she tied up to a dock at the fishing station. The captain and the three seamen in the yawl reached the shore in safety, at a place about two miles and a half from the end of White Fish Point, and about a quarter of a mile from the schooner. A fire was lit on the beach, and two of the seamen remained by it all night. The captain was ignorant of the fact that the tug had gone around the point, and went at once to find her. Being informed of her change of position, he got a lamp from a house near where he landed, so that he could find the

path across the point to the fishing station, where he was informed the tug might be found. Accompanied by one of the seamen, he set off at once, and made his way through the woods to the place where the tug lay. The master of the tug, a disinterested witness, testifies:

"[The captain] told me his schooner was ashore, and wanted me to go to her assistance; and I told him the weather was not fit for me to go around there. He told me to try; he would like to have me go around, and, if I could not do anything else, to save the crew."

The master of the tug refused to go then (it was about 2 a. m.), but promised to start as soon as it was daylight. The captain thereupon went back to the other side of the point, to return the lantern that he had borrowed. Progress through the woods was slow; so that, although the distance was not much over a mile and a half, it took him nearly an hour. About 3 a. m. the weather began to moderate, and, as it came to daybreak, he started to go back to the tug, when he saw her coming around the point, her master having started a little earlier than he promised. When the tug and schooner drew off into the lake, the captain and the three seamen again crossed the point to the dock, abandoning their yawl boat, and, when the tug returned, got on board of her, and regained the schooner.

It is manifest that these facts, which are undisputed, do not bring the case within either of the three categories above set forth. Even if the mate's statement of the conversation between himself and the captain be the correct one, it certainly did not operate as a discharge of the mate, or of the others of the crew who remained on board, from the obligations of their contract with the shipowner. The captain's story is that he said to the mate: "We have got to go ashore, and get assistance, and get her out of here;" and, when the mate refused to go, he went himself, taking the three seamen with him. Nor was there any abandonment. The case is on all fours with The John Perkins, supra, and Clarke v. The Dodge Healy, supra, where the vessel was "deserted on account of an immediate danger, and only during such danger, but animo revertendi if the danger should pass away." The acts of the captain in hurrying at once to the tug, and the request he made of its master, show conclusively that he had not abandoned all hope of saving the schooner. And certainly there was no shipwreck.

The decree of the district court is therefore affirmed, with costs.