## Case No. 2,849.

CLARKE et al. v. The DODGE HEALY.

[4 Wash. C. C. 651.] [1]

Circuit Court, E. D. Pennsylvania. April Term, 1827.

### SALVAGE—PLEADING AND PROOF.

1. The allegations in a libel, not admitted or denied by the claimants, are not to be taken as true, but must be proved.

2. Quaere, whether the forcible taking possession of a vessel exposed to danger, against the will of the commander; can entitle the persons so acting to the merit and reward of salvors, although they should contribute to save the vessel.

[Cited in The John Gilpin, Case No. 7,345; The John Perkins, Id. 7,360; The Choteau, 9 Fed. 211; The C. D. Bryant, 19 Fed. 606; The Cherokee, 31 Fed. 170.]

3. Unless the property be saved in fact by those who claim as salvors, salvage will not be allowed; be their intentions however good, and their exertions however heroic and perilous.

[Cited in The Narragansett, Case No. 10,020; Edwards v. Thirty-Five Boxes of Gold Dust, Id. 4,299a; Montgomery v. The T. P. Leathers, Id. 9,736; The Williams, Id. 17,710; The Cleone, 6 Fed. 525.]

[4. Cited in Bean v. The Grace Brown, Case No. 1,171, to the point that in determining the intention of a master and crew in leaving their vessel, great weight must be given to their subsequent acts.]

[Appeal from the district court of the United States for the district of Pennsylvania.]

In admiralty.

C. J. Ingersoll, for libellants.
J. R. Ingersoll, for claimants.

WASHINGTON, Circuit Justice. This case comes by appeal from the district court, where a pro forma decree, dismissing the libel, was given. The libel states that on the 24th of January last, the libellants, whilst in their oyster boats in the mouth of Back creek, in Delaware bay, saw the brig Dodge Healy drifting down the bay in a solid cake of ice, of about four acres in extent, from Cohanzey cove, about ten miles higher up the bay. In about three hours after they first observed her, she had drifted down opposite Back creek, and was proceeding in the direction of the Cross Ledge shoals, when she was abandoned by her pilot, officers and crew, who came on shore at Ben Davis's point; bringing with them, in their boats, their colours, compass, quadrants, clothes, bedding, cabin furniture, and other articles, as many as the boats would stow. That seeing the brig in this situation, threatened by the danger of running on the shoals, where she must inevitably have been either cut to pieces, or overwhelmed by the ice; they put off in their boat, with the intention, if possible, to save her. In about half an hour after they got on board, the mate, with some men

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

employed for the purpose, returned to the brig; but being informed by Clark, one of the libellants, that they had, and should retain possession of, and endeavor to save the brig, he returned to the shore, taking with him the papers belonging to the brig. After his departure, a consultation was held as to the best mode of saving the vessel, which resulted in efforts to cut a channel for the brig through the ice, so as to extricate her from her confinement in the mass; in which they, with great labour and peril, succeeded; the ice snapping in half from its great weight, as soon as the channel was cut through. The vessel was nevertheless driven on to Cross Ledge, and was in imminent danger, but finally she drifted off the ledge with the flood tide; but she was again encircled in a large cake of ice, from which she was again extricated by the libellants, by cutting the ice from around her; finally, they got her into water clear of ice, and by using the sails, ran her into a place of safety, where she remained in possession of the libellants; who intended to bring her to Philadelphia; until they were dispossessed by a writ of replevin issued by a court in New Jersey, under which possession was restored to the captain.

A claim was interposed by the owners and consignees of the vessel and cargo, and by the master; which does not admit that the vessel was saved by the exertions of the libellants, and professes entire ignorance of all the circumstances in relation to the alleged acts of the libellants to save her; none of the claimants having been present until the captain boarded her on the day she was conducted into a safe harbor.

The facts in this case, which are not disputed, are the following: After the Dodge Healy had ascended the bay as high as Cohanzey, or Ben Davis's point, finding that the ice was collecting in such a manner as to endanger her, she was forced ashore in Cohanzey cove, within about a half a mile of the shore, where she was soon encompassed by ice, and remained for about five days confined in a body of ice, from twelve to eighteen inches thick, and from two to four miles in extent up and down the river, and on her stern. During this time, the captain left the brig under the command of his next officer, and came to Philadelphia. In consequence of a very high tide, the ice lost its hold on the shore, and a cake some miles in extent, floated with the ebb tide down the bay, carrying with it the brig which was firmly fastened in it. In this situation, and believing from the direction the brig was taking, that she would drift upon the Cross Ledge shoals, where she would probably be cut in pieces, or be overwhelmed by the ice, the pilot ordered the boats out, that the officers and crew might avoid the apprehended danger by reaching the shore. After stowing away in the boats the articles stated in the libel, the officers, the pilot and crew, left the brig, whilst yet drifting towards the shoals, under

a confident belief that she would be driven on them and be lost. After they reached the shore, the mate with some of his men returned to the brig, and brought away other articles belonging to the crew which had been left on board. When within about half a mile from the shore on his return to it, he observed a boat pushing out of Back creek, and proceeding apparently for the brig: and apprehending that the persons in this boat intended to take possession of the brig, which it was his wish to prevent, he hastened on shore, and having engaged four or five volunteers to assist him, he returned to the brig, and got alongside within ten or fifteen minutes after the persons whose visit he had endeavoured to anticipate had boarded her. He found them on board, engaged in an attempt to extricate one of the cables from the ice: he told them they had better cut the ice from around the vessel; but was answered by Clark, one of the libellants, that he (the mate) had nothing to do with the brig, and that he (Clark) was then master. Whether the mate was ordered to leave the vessel, or whether he determined to do so in consequence of the assumption of the command of her by Clark, is by no means certain, the evidence being both ways, and nearly balanced. The fact is, that the mate having taken from the cabin some of the papers, departed with two of the men whom he hired to accompany him to the brig, the other three having deserted him and joined Clark's party, and are now numbered with the libellants. The captain returned the same evening, and was anxious to board the brig immediately, but was dissuaded by the mate from making the attempt before the next morning, when two efforts were made to get on board, and were defeated by the unfavourable state of the ice. He succeeded the next morning, and the persons on board continuing to assert their right to the possession of the brig, he prevailed upon them to take her into Cohanzey, where she was secured, and possession of her delivered to the captain under a writ of replevin.

The material facts disputed are: 1. Whether the brig was abandoned by the officers and crew, and was in a state of derelict, when she was taken possession of by the libellants or not; and 2. Whether the brig was saved by the exertions of the libellants from the imminent peril which, it is acknowledged by all, threatened her, at the time the mate first left her, as well as during the greater part of the time that she was in the possession of the libellants?

As to the abandonment, there are four witnesses who swear, that they heard the mate declare, upon his first landing from the brig, that she was abandoned, and that those who should save her would be well rewarded. The pilot states, that when he left the brig, nothing was said about returning, nor did he expect it was the intention of the mate to do so. Two other witnesses give it as their

opinion that she was abandoned, but form their judgment from what they saw, and not from any declarations by the mate or pilot to that effect. On the other side, the two mates swear positively that, although, when they left the brig, their expectations were that she would be lost on the shoals, towards which she was then drifting; yet it was their intention to return to her the next morning, in case she should escape the threatened danger. The same witnesses, together with William Bennet, concur in the statement that when the pilot had ordered out the boats for the purpose of quitting the brig, he expressed his apprehensions that she would drift on the shoals, and be lost; but added, that if she should escape that danger, she would return with the tide the next morning, nearly to the same place where they then were, when the officers and crew could return to, and again take possession of her. That the reason he assigned for advising the measure of leaving the brig, was, that, by no human exertions could they prevent her from going on the shoals, and being there cut to pieces, or overwhelmed by the ice, if the tide should force her on them; and that of consequence, it would be useless to remain in her. But he anticipated the possibility, at least, that she might take a different direction; in which event, the mate and crew might return with some advantage. But in judging of the mate's intention at the time he left the brig, I depend much more upon his subsequent acts, than upon declarations made by him to the other witnesses, or when he was himself examined, after this controversy had arisen. If his intention was to leave her to her fate, and to use no further exertions to save her, he could have no motive for remaining on the shore for the purpose of watching her motions, and of discovering her situation the next morning; as is testified by one of those very witnesses, who says he heard the mate declare that the brig was abandoned. When within a few hours after he had first left the brig, he discovered the libellants moving towards her, and suspected that their design was to take possession of her; what but a sense of duty, as commanding officer in the absence of the captain, could have induced him to hire another crew to assist him in regaining the possession, before it could be taken by others? The declaration attributed to him by some of the witnesses, that he expected to come in as a salvor; is not only denied by himself, but is incredible, as he must have known that he could not abandon as mate, and, in violation of his duty to the owners, claim the merit of a salvor. When he returned to the brig for the avowed purpose of anticipating the libellants in taking possession of her, why did he take with him his compass and quadrant, unless for the purpose of navigating her, in case she should be driven to sea? It is further in proof, that, when he engaged the men to accompany him to the

brig, it was under an express engagement on their part to stick by the vessel, and to obey his orders. I am, in short, quite satisfied that an abandonment of the brig, without the intention to return to her in case she should escape the danger that threatened her, was, at no period of time, in the contemplation of the mate; and that when he spoke of her being abandoned, he was far from annexing a technical meaning to the phrase, but merely intended to express the danger he apprehended her to be in, and his abandonment of the possession of her, until the danger should be over, or should appear to be less imminent. I consider the brig as having at no period of time been out of the constructive possession of the agents of the owners; if by continual claim, or acts in the nature of it, it could be retained. She was deserted on account of an immediate danger, and only during the continuance of such danger, but animo revertendi, if the danger should pass away. She was watched by the mate, and was always in his view whilst on the shore. The moment that he observed an attempt was making to take possession of her, he endeavoured to anticipate and prevent it, and asserted his right to the possession, which was retained against his will by the libellants. The same day that possession was taken by the libellants, the captain returned, used every exertion to board the brig immediately, and succeeded in doing so the day but one after. His right to the possession was denied and resisted by the libellants, but yet he remained on board until she was got into a place of safety; and he immediately applied to the civil magistrate, and succeeded in removing what, under all the circumstances of this case, I must consider as the tortious possession of the libellants.

The only remaining and the all-important inquiry is, whether the brig was rescued from the danger which impended over her at the time the libellants took possession of her, by any acts or exertions of theirs? Her extreme danger is admitted by all. She was fast locked in an immense field of floating ice, from twelve to eighteen inches in thickness, and her danger consisted in being drifted by the tide on the shoals below her, and being there cut to pieces, or overwhelmed by the ice, which, being thus resisted in its course, would probably accumulate and run over her. If the ice had been cut away, and a passage made for her extrication from it, she might have been saved; and if this was performed by the libellants, she owed her safety to them. This is agreed by all the witnesses who speak upon that subject. But unless she was so extricated, they all concur in saying, that no human force could have prevented her running on the shoals. She avoided the danger, however, as is stated by David Jones one of the libellants' witnesses, by the circumstance, providentially interposed, of her taking another direction than towards the shoals, and drifting to the eastwards of Ben Davis's shoals; by which circumstance, to use the expression of this witness, "she escaped." The impracticability of cutting a passage for the brig through so extended, and so firm and thick a body of ice, is proved by William Bennet one of the libellant's witnesses, Jonas Mason the second mate, and the other William Bennet, one of the claimants' witnesses. Whether the mere act of cutting away the ice around the brig would have saved her, or even diminished her danger, is uncertain from the testimony, the witnesses appearing to entertain different opinions upon that matter. It would seem to me that the pressure of the ice would have filled the opening almost as soon as it was made. But be this as it may, there is not one witness who proves that even that, or any other act, was performed, which did, or could by any possibility tend to the saving of this vessel. The libel, it must be admitted, makes out a case of some merit, and if it were proved would entitle the libellants to some compensation in the nature of salvage. It is not proved; but the counsel for the libellants has contended, that the facts alleged in the libel, not being denied by the claim and answer, must be taken for true. This is a doctrine as novel as it is untenable.

The respondents state in their answer that they were not present at the time of this transaction, nor can they of course admit or deny the facts stated as concerns this part of the case. As honest men, regardful of the sanctity of an oath, how could they deny the allegations of the bill, however extravagant or untrue they might be? But to argue that they must either do so, or subject themselves to the legal consequences of implicdly acknowledging them to be true, cannot for a moment be maintained. If the answer does not acknowledge the truth of the allegations of the libel, it must be proved by those who assert it. The maxims of the civil law—"ei incumbit probatio, qui dicit, non qui negat," and "nullus idoneus testis in re sua intelligitur;" are equally the maxims of the admiralty, equity, and common law courts. I am willing to allow to the libellants the merit of good intentions when they first boarded this brig. How far they continued to merit this praise, when, by the return of the mate with a crew, they perceived they were mistaken in their impression that she was abandoned, and persisted after that in holding the possession, and either expelling the mate from her, or denying his right to the possession and command, need not now be decided. If the question turned solely upon that point, I should have a word or two to say upon that subject; and I shall merely observe, for the present, that I am not to be considered as admitting that a forcible taking or retaining possession of a vessel by strangers, against the will of the officer who, with his own

crew, is capable of saving her without the forced assistance, if she can be saved at all, will entitle such strangers to the merit of, and to the reward due to salvors, although they should afterwards contribute to save her. Had the mate never left the vessel, but remained in the actual possession of her, it could not surely be contended that the libellants might, under the impressions, however honestly entertained by them, that she was in danger, and that their assistance to save her might be necessary, force themselves upon the mate in the character of salvors, against his will, and without the necessity for their aid being made apparent; and thus entitle themselves to the merit, and to the reward of salvors.

Without however pursuing that inquiry further, it may confidently be laid down, as an undisputed principle upon which a claim for salvage at all times rests, that unless the property be in fact saved by those who claim the compensation, it cannot be allowed, be their intention however benevolent, and their conduct however heroic. If providence kindly aids their exertions, by which the object is attained, so much the better for them; nor would that circumstance deprive them of merit, although it might diminish the rate of compensation; but exertions must be made, and the probability that they contributed, or might contribute to save the property should appear by some proof, although, from circumstances, slight proof only could be expected. I will not say that where the danger is proved, and the vessel is conducted by the asserted salvors into a place of safety, every presumption, in the necessary absence of other evidence, may not be made in their favour. But where it is proved by other evidence, as it is in this case, that no human force could have averted the danger unless a particular act was done, which act the same evidence shows was nearly impossible to have been accomplished, the court cannot say that the vessel was saved by the exertions of these libellants.

The general principle before stated is too firmly established by authorities to admit of controversy. "Salvage," say the court in the case of The Amelia, 1 Cranch [5 U. S.] 1, "is a compensation for actual services rendered to the property charged with it." And in the case of The Alerta, 9 Cranch [13 U. S.] 367, it is said, "salvage is allowed as a reward for the meritorious conduct of the salvor, and in consideration of a benefit conferred on the person whose property he has saved." It is also stated in the first of these cases, that not only must the service rendered be meritorious, but the possession taken of the thing saved must be lawful.

I am, upon the whole, of opinion that this is not a case of merit; and that the libellants have not shown that the brig was saved by their instrumentality. I have the pleasure to add that the venerable and learn-ed judge of the district court of this district, concurs entirely in this opinion. The pro forma decree of the district court must therefore be affirmed, but without costs.