DISTRICT COURT.                                    DECEMBER 17, 1858.

ADMIRALTY.

## THE ARCOLE.

## THE PHILADELPHIA STEAM PUMP AND TOWING CO., *Libellants*. JEANES & SCATTERGOOD, *Respondents*.

1. When danger has been incurred in rendering a salvage service, if the owners of a vessel which has rendered it, proceed in their own names and behalf, and not on behalf also of the salvors, to recover a salvage compensation, a decree will not, in general, be made for an amount greater than the owners' quota of the whole salvage.

2. The rule is, in general, the same, when actual danger has not been incurred; if the vessel, in rendering the service, has deviated from her course, or her voyage has been delayed.

3. But, when a salvage service, not attended with danger, has been rendered by a vessel, without any such deviation, or delay, her navigators are ordinarily not entitled to participate in the distribution of the compensation.

4. Therefore, the owners of a steam tow-boat and wrecker, so built and equipped for winter service, as to securely resist the impact and pressure of ice, may, in general, sue alone for, and recover the whole salvage compensation for such relief and assistance to other vessels as may be rendered by her in the regular course of her employment.

5. That such a steamer has not incurred any danger in rendering the service, and has performed it with ease, if her exemption from danger has been consequent upon her particular construction and equipment, and the ease of its performance has been due to the great power of her engine, will not ordinarily diminish the amount of salvage compensation to which her owners are entitled.

6. The criterion to determine whether the assistance rendered has been a salvage service, is, that it has afforded relief from actual or probable danger, distress, or extraordinary difficulty.

---

* See Biles *v.* Com., 32 Pa. St. R. 529, for the application of cognate principles to forgery under the common law.

7. If towage alone has afforded such relief, it should be compensated as a salvage service.

8. When a vessel has been engaged for the service of another vessel needing assistance, the circumstances existing at the date of such engagement, as well as those existing when the assistance is afterwards rendered, should be considered in defining the character of the service as salvage or otherwise.

9. Work, however arduous, performed with a view to rendering salvage relief, is not salvage unless its result has been successful, or beneficial.

10. When the work of a salvor, performed in successive stages, and only suspended at intervals between them, has been ultimately beneficial in its result, the whole, from the commencement, is ordinarily compensated as a single continuous or connected salvage service.

11. But this rule does not apply when such continuity of the service has been interrupted. Therefore, when an intended salvage service has been abandoned at the end of an unsuccessful stage of the work, and has been afterwards recommenced and prosecuted successfully, if any compensation is decreed for the former unsuccessful work, it is not measured by the standard of a salvage recompense.

12. The rule that a salvor cannot enforce a bargain as to his compensation which was made with a party requiring his aid at a time of danger or distress, is not always a sufficient preventive of extortion by salvors. Attempted extortion may sometimes constitute such misconduct as to cause a forfeiture or diminution of salvage compensation. Cases may occur in which the bare mention, at the time of peril or difficulty, of the rate or amount of compensation expected will constitute a species of extortion cognizable in a Court of Admiralty.

13. Exorbitancy in a salvor's demand of compensation made after the service has been successfully rendered usually affects only the question of costs. It will not ordinarily prevent him from recovering them, unless there has been a tender on behalf of the party benefited by the service of a reasonable amount of compensation.

LIBEL for towage and salvage service.

THE CASE involved questions, as to the winter towage and salvage service of heavy power steam tugs in the Delaware, which are sufficiently stated in the opinion of the Court. It was argued by Mr. R. P. KANE, for the Libellants, and by Mr. C. M. NEAL, for the Respondents.

CADWALADER, J.

The libellants, as owners of the steam-tug America, proceed in this case against the ship Arcole and her cargo, the vessel and cargo, together, worth between $50,000 and $60,000,

to recover a demand for towage, and alleged salvage service, rendered in the Delaware Bay, on the 30th of January, and 17th and 18th of February, 1857, and for subsequent winter towage from the Bay to Philadelphia. The respondents were consignees at Philadelphia of the Arcole, and owners of her cargo. The America is a large and powerful steamer of the class used as winter tow-boats, and occasional wreckers. They are sometimes called *heavy power tugs,* to distinguish them from the *light harbor tugs* employed in aid of the ordinary navigation of the Delaware, when it is unobstructed by ice.

In the navigation of this river and bay, the light harbor steam-tugs cannot always render the towage service, and other assistance, required in severe winters, particularly that required for inward bound vessels. The steamer belonging to the city of Philadelphia, known as the Iceboat, had, for many years, been employed in breaking the ice in the river, and keeping open the navigation in winter, when the City Councils, by an Ordinance of 27th July, 1850, authorized, under prescribed restrictions, her employment for an adequate compensation, upon any occasion of imminent peril, for the relief of vessels in the river or bay, or on the adjacent coast. This Ordinance had been preceded, and has been followed by Acts of the Legislature of Pennsylvania, to increase the facilities of the navigation through the aid of steam-power, etc., for the relief of vessels disabled, stranded, or otherwise in distress or danger, and for towage purposes. (See the Pamphlet Laws of 1850, pp. 59, 664; 1853, p. 660; 1856, pp. 64, 665; 1857, p. 269.) These acts incorporated Companies associated for affording such relief in different modes. The use of their boats in the respective modes thus authorized was not restricted as the above-mentioned Ordinance restricted that of the city iceboat; but they were, in general, prohibited from transporting goods or passengers in the river or bay. The last of this series of acts, passed on 21st April, 1857, shows that the policy of encouraging investments of capital for these purposes still prevailed in the State legislation at the dates of the occurrences of January and February, 1857, which are the subject of con-

troversy. The preamble of the first of the series passed on
12th of February, 1850, states that the want of powerful and
efficient steam-tugs to afford assistance in cases of stranding
has caused great losses of vessels and property. The libellants
were incorporated by the second act of the series, passed on
the 3d of May, 1850.

When a salvage service is rendered by the navigators of a
vessel, or other persons on board of her, these parties, and not
the vessel, or her owners, are usually deemed the salvors. The
vessel's quota of the salvage compensation, receivable by her
owners, is, in such a case, usually, though not always, a third
of the whole amount. In the usual form of a libel for salvage
at their suit, they proceed, as well on their own behalf, as on
that of certain salvors named, and all others interested. In an
ordinary case, if her owners, instead of proceeding in this form,
proceed in their own name, and on their own behalf alone, a
decree cannot properly be made for more than their own quota.
(1 Newb. 417, 329.) This rule applies, in a case otherwise
proper for its application, although no demand is made on
behalf of actual salvors, and although no contestant opposes
an objection that their interests are not represented by the
owners. The Court, of its own motion, where the rule applies,
makes the objection on account of the salvors not represented.
This rule applies almost and perhaps altogether without excep-
tion, where salvors have incurred *actual danger* in rendering
the service. Irrespectively, also, of any question of actual
danger, it applies when the service of nautical salvors has been
attended with such deviation from, or delay in, the course of
a voyage as is inseparable from salvage rendered in ordinary
navigation. Cases in which salvage service is rendered by
the navigators of a vessel whose regular employment is that of
a wrecker are not excepted from the operation of the rule
when the performance of their service is attended with actual
danger. The navigators and owners of the licensed Florida
wreckers, therefore, share the rewards received for their light-
erage service, and other useful assistance, rendered by them to
vessels which are stranded, or in danger of stranding, or other-

wise in peril or distress. (Marvin, § 199 to § 212 and Appendix, pp. 300, 303, 304.) The reefs on the Florida coast are hard and sharp, and the perils of navigation from the direct agency of the winds are there increased by the uncertain variableness of the ocean currents. These wreckers are small sailing vessels which always, on such a coast, share, in some degree, the dangers and hardships of such vessels as they may be able to relieve. But the danger which is considered in determining the definition of a salvage service is that of the property, or persons rescued, not that of the salvors. Danger incurred by salvors, though it may, sometimes, influence a Court in estimating their compensation, is not an essential part of the definition of a salvage service. When a steamer, whose ordinary employment is that of a tow-boat and wrecker, has rendered a salvage service in the *regular course of such employment without any danger* to those on board of her, the practice in England, and in the United States, has been to award the whole compensation to her owners. This has been the mode of adjudication in several of the cases which will hereafter be cited. If a different practice has prevailed in any of the judicial districts of the United States, the difference is attributable, probably, to conventional arrangements, or local usages. I am not aware that any such local differences in practice exist. The question does not affect interests of parties to whom past services have been rendered. It can effect prospectively the general interests of navigation so far only as the policy of encouraging the daring and enterprise of salvors may be concerned. I do not propose to inquire how far the distribution of compensation among domestic salvors for their services rendered, not upon the high seas, but within a territorial maritime jurisdiction in which the performance of such services is a part of the regular occupation in which they are engaged, may be regulated by local usages of the respective ports and harbors in which they are thus employed. The present case involves no such question.

The particular character of the winter salvage service of the America has recently been considered in the Circuit Court for

the Delaware District in the case of a salvage of the brig Caroline and her cargo. In that case, Chief Justice Taney thought it not a sufficient objection to the allowance of a liberal salvage compensation, "that the steamboat encountered no danger, and consumed but little time in rescuing the brig and cargo from the peril in which they were placed." In answer to this objection, he said: "It must be remembered that the steam-tug had, by the prudent foresight of her owners, and at a heavy expense; been prepared to render such services promptly and without much danger to herself, or her crew. She was strongly built, well manned, and placed at the breakwater in the Delaware, where it was well known many vessels must be detained at this inclement season, and would be constantly in danger from the winds and the ice. She was kept there at a heavy daily expense, and with her crew constantly exposed to severe weather, but yet always in readiness to go to the aid of a vessel in distress. It is the well-established policy of Courts of Admiralty to remunerate liberally salvors who risk life and property, or suffer hardships in rescuing a vessel or cargo when in danger of perishing. And I cannot perceive any reason why a salvor should be entitled to less, who expends his money in preparing a vessel by which the service can be rendered with less risk, and keeps her at the place where danger is anticipated, at a heavy daily expense, in order that assistance may be promptly rendered when the emergency shall arise. The reason assigned for a liberal allowance in the one case applies with equal force in the other." (Am. Law Reg., Feb., 1858, VI, 227.) These remarks were made in a case in which, though the America was not in any danger, some of her crew boarded the Caroline, and may perhaps have been exposed to particular hardship if not danger. Whether they received any portion of the salvage decreed, I do not know. The report seems to state the case as if the whole was awarded to her owners. I have not inquired how the decree was, in this respect, framed, because, in the case before me, the services were not rendered under circumstances involving any salvor in personal danger. In the present case, the navigators of the

America were exempted from the dangers which would otherwise have been attendant upon the performance of the services rendered, because her owners had invested their funds in constructing and equipping her in the particular mode which Chief Justice Taney has described. His reasoning was adapted to the effect attributable to this outlay of their funds as between them, and the parties to whom the salvage service was rendered. Its logical application, in the present case, is, however, scarcely less direct in excluding her navigators from any share of the compensation for a salvage service in the performance of which their security from danger had been purchased for them by the same investment of the libellants' funds.

For the twofold, or compound reason, that no danger was incurred by any person on board of the America in rendering the service in question, and that the service, if legally salvage, was rendered in the regular course of her ordinary winter employment, I have no difficulty in deciding that her owners are entitled to the whole of any salvage for which the Arcole and her cargo may be liable.

The regular employment of a steam-tug, in aid of a navigation liable to obstruction from ordinary local causes, may require her, in the performance of her ordinary duties of towage, to render incidental, or occasional services more arduous than those elsewhere impliedly contracted for by tow-boats. The assistance which she may thus render in the course of her business is not a salvage service, unless it relieves persons or property from actual danger, distress, or unusual difficulty. The large and powerful steam-tugs employed to facilitate the navigation of the Mississippi constantly take across the bar near the mouth of that river, vessels whose draught is greater than the depth of water in the channel. The bottom there is of shifting layers of soft mud, through which such vessels are dragged without encountering any resistance which persons of nautical experience deem dangerous. The chance of grounding on this bar, as has appeared in a case recently considered in this Court, is encountered voluntarily for the advantage of carrying a full cargo. Vessels are often aground there for

hours or days, and sometimes for weeks, before they are dragged through. Compensation for this heavy towage through the muddy bottom, and occasionally also for incidental assistance rendered by the tugs as lighters, is, I believe, often paid at somewhat high rates. But these rates are not measured according to the standard of the salvage remuneration which would be chargeable if the vessels aground were in danger. Some shoals higher up the river, where the bottom is sandy, are there called sandbanks. Grounding even on these banks does not appear to be considered a dangerous occurrence in the navigation of that river. The Leathers, a steamer on fire, and scuttled, was run upon such a bank, about sixty miles above New Orleans, in order to save the lives of the persons on board. Another steamer, called the Robb, aided by a third steamer, the St. Charles, hauled the Leathers off the sandbank. For certain *other* acts, a salvage compensation was awarded to the Robb, but none to the St. Charles. As to the assistance rendered by the St. Charles in drawing the Leathers off the sandbar, the Judge said: "We are told by the pilot of the Leathers that the power of the Robb was sufficient without her. Besides, *the drawing a boat off when aground is a common act of courtesy among steamboats, for which no claim of salvage is ever asserted.* If the services of the Robb had extended no farther than this simple act of courtesy, it is hardly probable that she would have asserted any claim for salvage compensation." (1 Newb. 429.) In the definition of salvage services in other waters, little aid is derivable from rules which local physical peculiarities and local usages have thus established for the navigation of the Mississippi. The navigation of that river may be contrasted with the above-described navigation upon the coast of Florida, where no vessel can approach any of the shoals without incurring a liability to danger. Neither navigation furnishes a proper analogy to that of the Delaware.

To define for the navigation of the Delaware the difference between certain acts of the regular winter towage service of such a tug as the America, and acts of salvage may, sometimes, perhaps, be very difficult. The regular employment of a winter

tug, in aid of navigation so liable to serious obstruction from ice, must require her in the performance of her duties of towage to make occasional deviations and rests, and render to her tows occasional services more arduous than those performable by light harbor tugs when the river and bay are clear of ice. An indiscriminate imposition, in favor of her owners, of salvage charges for the towage services rendered in the performance of her winter duties would frustrate the salutary purposes for which the libellants and other such associations are incorporated. On the other hand, motives of justice, not less than of policy, require that the navigators and owners of such a tug should receive a reasonable salvage compensation for the services which they may render in relieving vessels from danger or distress.

When the service rendered is that of towage alone, the criterion of the right to salvage is the existence of distress, danger, or extraordinary difficulty from which the towage service rescues the vessel towed. The towage may thus be the means of rendering a salvage service, or, as the proposition has been more succinctly stated, the *towage may constitute salvage*. Judge Betts, an Admiralty jurist of great experience, referring to cases of vessels in distress, or peril, requiring towage, has said : "I am not aware of any determinate rule of law which discriminates towage service from salvage. It is manifest that circumstances may exist rendering towage the most efficient, if not the only service which can be afforded in saving property and life. A dismantled and disabled ship of large burden filled with passengers may be thus rescued by a very small vessel wholly inadequate even to receiving on board the sufferers on the wreck. It has therefore never seemed to me that any advance was made towards solving the question whether a service was salvage in its character, and to be rewarded as such, by proving that it was performed by towing only. If there is any intrinsic difference between towage and salvage, it would appear to be only that salvage service must always be that given in rescue or relief of property in imminent peril of loss or deterioration, while towage may be applied merely in aid of a

vessel against adverse winds or tides, or in difficult passages, while she is in possession of her ordinary powers of locomotion. (Abbott, 227, 228.) In England, Sir John Nicholl once observed to the Trinity Masters, "that to estimate a salvage service, all the circumstances must be taken into consideration in a *combined* view; and that if towage led to the rescue of a vessel from danger, it should be remunerated as salvage; or, if an engagement even were made in port to go out, and to tow, yet that unforeseen cicumstances might convert such towage into a salvage service." (3 Hagg, 428.)

Under an ordinary contract for simple towage, performable by a light harbor tug, or other steamer, her service, if successfully rendered, becomes that of *salvage,* so soon as an unavoidable cause, not attributable either to her insufficiency, or to the fault of her navigator, makes it impracticable for her to conduct the towed vessel in the direction of its destination. When the performance of the service originally contracted for thus becomes impossible, the tug is not at liberty to abandon the vessel she has engaged to tow. Her duty requires her to render all the assistance in her power in bringing this vessel to a position of security. The late case of the Galatea in the English Admiralty (May 22, 1858,) recognizes the existence of a rule that the tug, for so doing, is always "entitled to a salvage remuneration."

When a vessel not in tow incurs any danger, and afterwards engages and receives towage aid which rescues her from the danger, the rule is also to remunerate the service as *salvage.* This rule has been applied by the English Court of Admiralty where the towing vessel was a steamer, and the vessel towed was afloat at the commencement of the service, and continued afloat until its termination, jury rigged, and with a fair wind, and the service, though she was in distress, was not essential to her safety. The steamer incurred no risk. There was nothing to strain her engine. The Trinity Masters were of opinion that the nautical service rendered "was merely towage, but should be handsomely rewarded." Sir John Nicholl decreed a compensation which, from its amount, can only have

been awarded as *salvage*. (3 Hagg. 427.) This decision has been followed in the Southern District of New York, where the vessel which rendered the towage service, and received a salvage compensation was a harbor tug of the class of "professional wreckers and towers." An extract has already been given from the opinion of Judge Betts in this case. In this opinion the English cases prior to 1848 are cited. (Abbott, Rep. 222, 234.)

In determining the rate, or amount, of salvage for a towage or other service the rule of the English Admiralty is that, other circumstances being alike, steamboats, as having the ability to render more prompt and efficacious assistance than sailing vessels, are encouraged by a more liberal reward. The motive of this rule is one of policy that steamers may be induced to leave their ports, or turn aside from their voyages, to volunteer their services to vessels in danger or distress. Judge Betts has therefore questioned its applicability to steamers of the class of *professional wreckers and tow-boats*. He thinks that their superiority to sailing vessels for such service will secure the preference for that employment when they can be obtained, and that their "calling of itself will be sufficiently encouraging and advantageous without the aid of the stimulus of high salvage rewards." "At most," he says, "in reference to mere harbor service, and that rendered about the mouths of their own ports, it is by no means manifest that steamers whose regular pursuit is to tow and relieve vessels, should be regarded as meriting a reward out of all relation and proportion to what would have been accepted as satisfactory on a fair bargain for their services." (Abbott R. 234.) These remarks probably were intended, however, as applicable only to tugs making short trips between New York and Sandy Hook, in a harbor unobstructed by ice. At the date of his opinion their services for the relief of a vessel in distress might under what he thus called "a fair bargain" have been obtained for $10 per hour, computing the time from the commencement of the expedition until the return to the point of departure. His objection was to the allowance of a disproportionate excess above

this rate of their service. In the case before him, which was not one of any particular merit, he allowed salvage at five times this rate.

Chief Justice Taney, in the above-cited case of the Caroline, appears to have considered such limited views on the subject of salvage compensation inapplicable to a steamer like the America on duty between New Castle and the Capes of Delaware in the depth of a severe winter. In that case, the Caroline, the vessel assisted, was at the breakwater. She had sustained injuries from contact with heavy floating ice, and required lightening that she might be repaired, so as to resist the further impact and pressure of the ice, which might otherwise, at the next ebb tide, have been very dangerous. The service of chief importance rendered her by the America was that of lighterage. The America, being then very nearly out of coal, was able to render this service with facility to great advantage. The crew of the Caroline were, moreover, opportunely reinforced by men from the America, who aided in the removal of the Caroline's deck load, which had been so frozen fast, as without such assistance to have baffled efforts to get at the lading below in order to lighten her. "The salvors," in the opinion of the Chief Justice, "were entitled to the same measure of compensation that the Court would have deemed just if the vessel had been rescued by the boats of the surrounding ships, amid the hazards which such an enterprise, on their part, would evidently have brought with it." The situation of the America, in this case, he said, "was unlike that of a steamboat that goes out of her way for a short distance, and delays her voyage for a few hours, in order to afford the necessary relief. _Her_ sacrifice of time and labor would be small. But here was a daily heavy expense; and she was always prepared, at the point of danger, when assistance was needed." (Am. Law Reg., Feb., 1858, VI, 227, 228.)

In the winter business of the Philadelphia city iceboat, a trip, not in the service of a particular vessel, but for the towage, at prescribed rates, of any such vessels as may require it, is called a "regular tow." The "charge for the use of the boat, not in

a regular tow, and not relieving vessels in distress," is $15 per hour from the commencement of the expedition until her return. This charge for ordinary winter towage, or other ordinary winter service, is also made by two of the incorporated companies mentioned above, each of which employs a heavy power tug in the river and bay. But there is no regular charge for the time occupied by either of these tugs, or by the iceboat, when engaged in the service of a vessel in danger, distress, or extraordinary difficulty. At the dates of the occurrences detailed below, the iceboat was not engaged in any service in the bay. Her boilers were adapted to the river service only. She was, at no time during this period, below Reedy Island. Of the two other heavy power tugs, one was absent, having gone to a Southern port. The only tow-boat of this class below Reedy Island was the America. The only other steam tow-boat of any kind at hand was a light harbor tug, which appears to have received on one occasion $10 per hour for such assistance as she was able to render when in the service of a stranded vessel.

The Arcole reached the bay, inward bound, on the 30th of January, 1857. On that, and several following days, the river was filled with floating ice, of which large quantities were in the bay, occasioning as it came down serious injury to some vessels, and peril to others. The ice rendered it unsafe to proceed further upward than the breakwater, where it was to many vessels important that an anchorage should be reached without loss of time. The services of the America were, therefore, in great request. She charged large sums of money for the towage of vessels for very short distances. The America, on that day, towed the Arcole to the breakwater, where she was anchored. This towage service occupied, as has been said, only seventeen minutes. The Captain of the America charged, and the libellants now demand, for it, the sum of $250. This demand is disputed. Its reasonableness has not been shown otherwise than by proof that he charged amounts almost, perhaps, as high proportionally, for similar towage of other vessels whose navigators acquiesced in, or submitted to, the

demands. They, perhaps, may have thought that they had no alternative. Their acquiescence, however, fortifies other evidence from which the conclusion appears to be that this towage service entitled the America to a reasonable salvage remuneration. The proper amount of this compensation cannot, however, approximate the sum demanded.

On the same day, the 30th of January, the America left the Arcole at the breakwater. On the 1st of February, the America rendered to the Caroline the salvage services above mentioned. In compensation for them $1,700 was afterwards decreed by the Circuit Court for the Delaware District, whose opinion in the case has already been twice quoted. On the 2d of February, the America went for fuel to New York. She there took in coal, which probably prevented her from performing lighterage service with facility after her return to the Delaware Bay. The testimony does not state when she returned; but we find her again at the breakwater on the 7th of February. Between the 7th and 10th, she was, when not at anchor, cruising among the vessels detained at the breakwater, supplying some of them with provisions. On the evening of the 10th, she towed the same brig Caroline, which had been assisted on the 1st of the month, and a large ship to New Castle. So far as the Caroline was concerned, the compensation for this towage was included as an incident, or completion of the prior salvage service, in the $1,700 decreed as above. The America remained ice-bound at New Castle for two days. On the 12th, she got out, went down to the bay, and towed up some vessels to New Castle, where she left them, and went down to Reedy Island. She remained at Reedy Island until the 14th.

In the meantime, the Arcole, from the 30th of January, when she was towed, as above, to the breakwater, had been detained there by the ice, until the 11th of February. A pilot, who had boarded her on the 30th from the America, had not left her. Under his direction, she got under way on the 11th, and proceeded a few miles; but, seeing ice ahead, returned to the breakwater. On the 12th, she again got under way with a

fleet of vessels which had been detained at the breakwater, and made some progress, when, encountering a head wind, she was anchored for the night. On the 13th, she was surrounded by skim ice. The wind being still ahead, her direction was changed with a view to returning to the breakwater; but, the wind dying away, she was anchored for another night. On the next morning, the 14th, she resumed her course upward and proceeded for some distance; but was caught, first in one floating field of ice, and then in another, and taken out of her course until she grounded on a hard sand shoal below the mouth of Cohansey Creek. She was aground for four days. Witnesses who describe her position testify that it was one of some danger. Her draught was between 17½ and 18 feet. At high tide, there was perhaps nearly enough water to float her. "At low water," in the language of one of the witnesses, "she heeled down, lay hard on the bilge. Sometimes she would heel down and heel up, according to the wind and tide, and local causes." She was a sharp built vessel, and not new. The ice had cut her a good deal before she grounded, and it also cut her while she was aground. But she did not then, or at any time afterwards, leak. Her danger depended upon her liability to two hazards, the one, that of the ice above shifting and coming down so as to cut her through, the other, that of such a gale as might have caused her to bilge. Neither occurrence, perhaps, was at that season very improbable. But there was, in fact, no stormy weather, nor did any main body of ice come down while she was upon the shoal. She seems to have been, at no time, in *immediate* peril. By lightening her, she could, in a few hours, have been set afloat; and the conduct of all parties, in the four days that she remained there, indicates that she was not regarded as in any serious eventual danger. Any assistance to set her afloat would nevertheless have constituted a useful salvage service; and there, unquestionably, was urgent need of some such assistance.

Many other vessels in the bay were in distress or difficulty. One of them, the Mahlon Williamson, was aground upon a shoal above the Cohansey. The Williamson and the Arcole

grounded on the same day, the 14th. They were about seven miles apart.

On the 14th, the America left Reedy Island, and went down the bay, visiting, in succession, the Williamson and the Arcole, both aground. She did nothing on that day for the relief of either vessel, but rendered some towage service to other vessels which were afloat. She took the captain of the Arcole, with his niece, and a trunk of baggage, to New Castle, from which place he communicated, by telegraph, with the respondents. The America remained at New Castle until the next morning, the 15th, when, at about ten o'clock, she got under way, with the captain of the Arcole on board, and went down to the Williamson. She tugged with a 10-inch hawser at the Williamson, for an hour and a half, and succeeded in changing her position on the shoal, but could not get her off. At the end of this time the hawser broke. The captain of the America was then requested by the captain of the Arcole to proceed to his vessel. To this the captain of the Williamson objected, insisting upon the America remaining with the Williamson. At about this time, the light harbor tug mentioned above was passing. The captain of the Williamson then engaged this small tug for the next high tide, when the work of pulling off the Williamson was to be resumed by both tugs. In the meantime, the captains of the Williamson and the Arcole made "a sort of compromise" under which the America remained at anchor near the Williamson, and the two captains went in the small tug to the Arcole. They did not reach her until the tide was very low. They went on board of her, and remained there about three-quarters of an hour, after which they returned to the Williamson, where the America was still at anchor. The captain of the Arcole then again went on board of the America. The work at the Williamson was resumed on the 16th. On this day she was got off, and was towed into the channel to a point about two miles distant from the shoal on which she had been stranded. Both tugs remained with her until the 17th, when they left their moorings, and proceeded to the Arcole. Her captain had been all this time on board

of the America. A consultation took place from her deck between him and the pilot, who was on board of the Arcole, as to the expediency of trying to get the vessel off by tugging without previously lightening her. The pilot said that it would do no harm to try. The captain replied, that "it would be a harm if the ship didn't come off." They nevertheless determined to try the experiment. The America drawing no more than about twelve feet of water, and the other tug only about six feet, they had every opportunity to pull her off if it could have been done without lightening her. They made the effort, both tugs pulling together, beginning the work at about high tide, and continuing it perseveringly for, perhaps, more than two hours without moving her, when the hawser of the America broke. It was a new 10-inch hawser. The captain of the Arcole then despatched the small tug to the Cohansey to engage a lighter. One of 200 tons was accordingly brought down to the Arcole. The America had, in the meantime, left her. The respondents, in their answer, state that she did so under an engagement to return by the next high tide. There is no proof that any such engagement was made. If it was *not* made, the America cannot be said to have *continued in the service* of the Arcole. If it *was* made, it was *not fulfilled.* Before the next full tide, the lighter had taken out a portion of the Arcole's cargo. At full tide the America was not at hand. The small tug tried to pull off the Arcole, but failed in the effort. This tide was thus lost. The work of lightening her was then resumed. Her captain went, in the small tug, to bring back the America. In the meantime, the America had returned to the Williamson, had towed her to Delaware City, and had also performed some towage service for another vessel. On the 18th, in the afternoon, about an hour before the next full tide, the captain of the Arcole returned to her with the America. During his absence, the discharge into the lighter of the Arcole's lading had been continued until she was raised in the water about a foot and a half above her draught when she grounded. The respondents allege that, when thus lightened, she, at high tide, floated in the bed which

had been formed by her previous oscillations in the sand. This, though not directly proved, may perhaps be inferred from the testimony. Though she may have thus floated in her bed, she certainly, however, did not so float that she could have been taken from it into the channel without aid of some kind; and she, probably, was not in a situation to have dispensed with towage assistance. She was, nevertheless, at full tide, *without any difficulty,* drawn by the America into the channel. The America afterwards took her to Philadelphia without encountering any difficulties on the way other than those of the ordinary winter towage.

The respondents admit that the work performed at the shoal by the America should be liberally compensated. But they deny that it was a *salvage* service. We have seen that three trips, in all, were made by the America to the Arcole when aground. On the first, nothing to relieve her was even attempted. Three days intervened before the second, when an effort was made which wholly failed of success. Between this attempt and the third visit, she was lightened, the America not participating, directly or indirectly, in the lighterage service, or being in attendance, or even at hand. On the third visit the America, whose prior service had been wholly ineffectual, was, in consequence of the intervening lighterage, able, with ease, to draw her off.

Had the Arcole not have been thus lightened between the America's failure, on the 17th, to get her off, and return to her on the 18th—or, had the America performed or participated in the intermediate work of lightening her—or, without participating in it, remained in her service after the unsuccessful tugging on the 17th—the work on the 18th, of drawing her off when lightened, might, fairly, have been deemed the successful termination of a *continued* service, rendered on the two days, by the two tugs, aided, in the later stage of the work, by the Cohansey lighter. But the America, when her hawser broke on the 17th, and lighterage was resolved upon, left the Arcole and was employed in assisting other vessels. For aught we know, if she had not been specially re-engaged on the 18th,

she would not have returned to the Arcole at the shoal. Her work at the Arcole on the 17th, and resumed work of the 18th, were, therefore, distinct unconnected services.

Her work on the 17th, considered separately, however arduous, and however faithfully performed, having been altogether *unsuccessful,* was not a *salvage* service. The Circuit Court, for this district, in the case of the Dodge Healy, in the year 1827, recognized, as undisputed, the principle that a claim for salvage, however meritorious, never can be allowed unless the property has been in fact rescued from danger, or the service rendered has otherwise resulted beneficially. (4 Wash. C. C. 651, 656.) This rule has been since applied in the English Admiralty. (3 Notes of Cases, 589.) Where the work of assistance has only been suspended at recurring intervals between successive stages of its performance, its continuity is not so interrupted that, if it is ultimately successful, the whole of it from the commencement of its first stage will not constitute a single salvage service. In the case of the Mahlon Williamson, of which the circumstances have been detailed, the service rendered by the America was of this continuous character. She remained at the side of the Williamson, in her service, during two tides, though not at work in the intervening period, and ultimately placed her in the channel with her entire cargo on board. For the entire service rendered in this case referees of great nautical experience therefore awarded a salvage compensation of $3,000. But, where the continuity of the service has been interrupted by its abandonment at the end of an unsuccessful stage of it, the circumstance that it has been subsequently recommenced, and, after such resumption, prosecuted with ultimate success, cannot prevent the former stage of it from falling within the rule applicable to a single unsuccessful service. The case of a steamer in the Mississippi River, called the Leathers, has already been mentioned. She was on fire, and, in order to save the lives of those on board, was run hard ashore on a sand bank, having been scuttled for the purpose of extinguishing the fire. Another steamer, the St. Charles, coming to her assistance, made strenuous but unsuccessful

efforts to pull her off the bank, and extinguish the fire. A large portion of the deck load of the Leathers was taken on board of the St. Charles, under an agreement that she should carry it to its destination, and receive the full freight. A third steamer, the Robb, afterwards arrived. As has already been stated, the Robb, aided by the St. Charles, hauled the Leathers off the sand bank. The Robb took on board the passengers of the Leathers, and a large portion of that part of her deck load which had not been previously taken off by the St. Charles; and subsequently rendered important salvage services in which the St. Charles could not participate. Judge McCaleb allowed a liberal salvage compensation for the services rendered by the Robb. He decided, however, that the St. Charles was not entitled to compensation as a salvor. His views of the service rendered by her in assisting to draw the Leathers off the bank have been stated under a former head. He was of opinion that the freight of the goods transshipped from her deck was a sufficient compensation for the service performed in removing them, and for any other assistance that had been rendered by the St. Charles. He thought that the work performed by her before the arrival of the Robb *had not resulted in any benefit,* and *therefore,* however meritorious in itself, was *not* a salvage service. ( I Newb. 428.) The case of the Pandora, before the same Judge, was that of a bark laden with cotton discovered to be on fire while she lay moored at a wharf at New Orleans. By order of the proper authorities of the city she was towed by a steam tug across the river to a point near the opposite shore, where *other* parties afterwards rendered services for which a salvage compensation was decreed. The Judge said of the tug which towed the burning vessel across the river: "I cannot regard her in the light of a salvor. She did not actually save the hull of the bark and her cargo, for she abandoned them before they were finally rescued by the salvors." But he decided that this tug, though she had not earned salvage, was entitled to a reasonable compensation for *towage.* ( I Newb. 442; see 3 Notes of Cases, 589.)

The America, for her unsuccessful tugging on the 17th,

should be compensated, neither as a salvor, nor as a mere winter tow-boat, but as a wrecker specially engaged in arduous work of which the performance was attended with frequent shocks and strains of her hull and engine. The work described by the witnesses which finally broke a new 10-inch hawser would not be more than barely compensated by an allowance of three or four times her ordinary towage charge of $15 per hour, computing the whole time four hours, of which two may be estimated as the duration of the full tide, and one may be allowed for each of her passages to and from the shoal. An expectation of receiving even such a compensation might often, perhaps, be an inadequate inducement to the performance of such work, if the prospect of a successful result did not encourage the hope of receiving a salvage remuneration.

The successful assistance rendered by the America to the Arcole on the 18th was a *salvage* service. The respondents object that when the America arrived at the shoal on that day, the Arcole had been so lightened as no longer to be in danger. But, assuming that she floated in her bed at high tide, there is no reason to believe that she could have been gotten out of it, without further lighterage, by merely carrying out anchors. If getting her off in this mode had been possible, it would have been tried. If it would otherwise have been possible, we do not know how far it might have been interfered with by ice. The evidence indicates, I think, that she was neither in fact, nor in her master's opinion, in a situation to dispense with steam towage; and I doubt if she could, without great imprudence, have dispensed with a heavy power tug's assistance when such aid was obtainable. (See 3 Hagg. 386.) The fact that the America *was* re-engaged in her service on the 18th, goes far towards proving that there was a contingent, if not absolute, necessity for such assistance. The *purpose* of re-engaging her must have been that her towage, assisted by the effect of the previous lighterage, might *insure* the Arcole's extrication from her difficulty without the loss of another tide. Had the America herself performed in succession the two services of a lighter and a tug, they would have together con-

stituted a compound salvage service of which neither element could have been disregarded. The distinction that they were performed by two vessels might have been attended with a material difference if the lighterage service had been completed and the Arcole afloat before the re-engagement of the America. But such was not the fact. The lighterage was continued, as has already been stated, while the captain of the Arcole was absent, on his expedition in the small tug to bring back the America. The re-engagement of the America therefore occurred when the effect of the lighterage must have been to some extent unknown. When a steam tow-boat and wrecker, or other steamer, or, indeed, when a vessel of any kind, is engaged to come from a point at any distance to the aid of a vessel in distress, the character of her service as *intended* at the time of making the engagement, as well as the character of the service afterwards *rendered* under it, should be considered. Upon a question of salvage, according to decisions which have been cited, a view of all the circumstances in *combination,* commencing at the time of her engagement in the service, is to be taken. (Abbott Rep. 222; 3 Hagg. 428.) The *intended* service must in such a case be understood, for the present purpose, as including all *probable* assistance which, under the knowledge possessed at the time and place of her engagement, may have been contingently requirable in order to effectuate the desired relief. In the first case in which salvage was decreed in England in favor of a steamer, she was engaged at Dover in the service of a vessel in the Downs bound for Ramsgate. This vessel had struck upon a sand, but, before it was decided to engage a steamer, had been removed from it by the assistance of a small sailing vessel of the class known as Deal boats. Lord Stowell, after observing that the vessel assisted was no longer *in a situation of actual danger,* said: "but still there was an *apprehension of danger,* and provision was required to be made for the future safety of the vessel. It was recommended that a steam vessel from Dover should be sent for. It therefore cannot be denied that the agency of a steamboat was considered highly useful and desirable. * * *

The vessel was of great wealth. She resorted to the assistance of a steamboat, after having resorted to one of a lower species." (1 Hagg. 246.) These passages are the only parts of his opinion which concern the situation of the vessel assisted. They apply in the present case to the objection under consideration. But there was more than "an apprehension of danger," as to the Arcole, when the America was, on the 18th, engaged to return to her assistance. How far the lightening of her then in progress might lessen the danger by the time of high tide, when the ultimate service was to be rendered, was a contingency of which the determination could not be foreseen. How, in fact, it was determined, we do not, at this day, know. The allegation that the danger was at an end rests upon the fact that the ultimate service was performed with ease. But this ease of its performance may be attributable solely to the great power of the America's engines. Her service was required for the sake of their power. The small tug might again, as at the previous tide, have been unable to move the Arcole. The greater power of the America enabled her not only to move her, but to do it with ease. This ease in the performance of the work does not deprive it of the character of a salvage service.

The *amounts* of compensation for the several salvage services of 30th January and 18th February, and for the intermediate work of the 17th, which was not salvage, are, lastly, to be determined.

The captain of the Arcole appears to have known the rule of law that a salvor who has rendered a successful service cannot, in general, enforce a bargain as to the rate or amount of his compensation made by him at the period of danger, or distress, with a party requiring his assistance. He appears also to have known that a salvor, by insisting on such a bargain being made before he renders the service, may sometimes incur a prejudicial imputation of extortionate conduct. But he seems not to have been aware that a salvor should, under some circumstances, avoid the previous discussion, or even *mention*, of the subject of compensation. This ought to be the rule of

his conduct under circumstances which give him a continued or temporary *monopoly* of opportunities of rendering salvage services of which vessels in danger, distress, or difficulty cannot refuse the proffer. Such a tug as the America, in consequence of the more or less prolonged absence of other steamers of her class from the river and bay, may often thus have a monopoly of the opportunities, which the difficulties of a winter navigation afford, of making salvage profits from dangers encountered by sailing vessels. This was the case at the dates of her services in question. Every vessel of the large fleet then in the bay would have been greatly benefited by steam towage, or by such other assistance as the America *alone* was at hand to render. Nothing but unjust extortion on the one side, or injudicious parsimony on the other, could have induced the rejection by any of these vessels of an offer of her services. A very limited number of them only, however, could receive her assistance, and none of them, perhaps, could obtain it to the full · extent which was desirable. Circumstances gave to her captain the choice of the vessels to which her assistance should be rendered. This choice he was not at liberty to regulate, at a crisis of peril or difficulty, with a view to her owners' emolument. He was bound, in the first instance, to rescue, or aid, such vessels as might be in the greatest immediate or eventual danger, or distress, without any discrimination with a view to the expected profit from assistance to one vessel rather than to another. At such a crisis, to discuss, or mention, the rate or sum expected in the way of compensation might, in effect, be to indicate that the readiest service would be rendered where the greatest compensation might be expected. This would be scarcely less extortionate than to insist upon a positive bargain, such as no salvor is at liberty to require at a season of such peril.

Ordinarily, a mere attempt at extortion by a salvor may not involve a forfeiture of his compensation, or even cause a reduction of its amount. The courts have usually been content with manifesting in their decrees a disregard of all bargains as to salvage compensation which have not been made· with a fair

opportunity to select the person engaged among a sufficient number of parties capable and ready for the service. But, in the case of a salvor whose professed occupation is that of aiding vessels in distress, and whose only legal merits are those inherent in such an occupation, any misconduct in imposing exorbitant demands upon parties unable to decline offers of his assistance ought not less to cause a reduction, or sometimes even forfeiture of compensation, than misconduct of other kinds usually followed by such consequences. Direct extortionate conduct in requiring previous bargains to be made by parties relieved, may sometimes be not less liable to censure than indirect extortion consisting in the suggestion of expectations which parties in danger may think it unsafe to disappoint. The mere non-enforcement of a previous bargain as to compensation, therefore, may not always be a sufficient preventive of extortion.

In the present case, the testimony on this point is not very distinct; and the subject has not, apparently, attracted much of the attention of the opposing litigants. I cannot, therefore, on this ground, without further investigation, make a deduction from the salvage compensation which would otherwise be decreed. On the other hand, there is more testimony on the subject than I can wholly disregard. If the respondents ask a reference of the case to a commissioner on this point, I will therefore order it with special instructions defining his duties. Unless the reference is asked, I will, however, assume that, upon the result of such an investigation, the conduct of the captain of the America would be so explained as to appear liable to no just censure. If the reference is not asked, I will, upon this assumption, make a decree in favor of the libellants for $1,000. This I think a liberal recompense.

The libellants have demanded $3,500. This demand may seen exorbitantly high. But such exorbitancy is a usual incident of claims for salvage. When it does not occur until after the service has been rendered, it affects only the question of costs, which ordinarily follow the decree unless the party benefited by the salvage has made a tender of a reasonable amount

of compensation. In the present case, there has not been any tender, formal or informal, before or since the commencement of the proceedings. In the correspondence which preceded their commencement, the respondents professed a willingness to settle the demand upon reasonable and liberal principles; but they named no sum of money which they were willing to pay. The costs of the cause, including, probably, those of the reference if it should be ordered, must, therefore, be borne by the respondents.

No reference was asked on behalf of the respondents. The decree was for $1,000 and costs. Both parties acquiesced in the decree.